Corey **CALDWELL,** Defendant
Below, Appellant,

v.

**STATE of Delaware,** Plaintiff
Below, Appellee.

No. 118, 1999.

Supreme Court of Delaware.

Submitted: Nov. 28, 2000.
Decided: April 26, 2001.

---

Leo John Ramunno, Wilmington, Attorney for Appellant.

John Williams, Department of Justice, Dover, Attorney for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices.

STEELE, Justice.

On December 10, 1998, a jury convicted Corey Caldwell of Possession with Intent to Deliver Cocaine, Possession of Drug Paraphernalia and Resisting Arrest. Caldwell filed a timely notice of appeal.

On this appeal, Caldwell raises six issues in support of an argument that he was denied a fair trial. Caldwell contends that: 1) the Superior Court abused its discretion by denying Caldwell's request for a continuance after he had retained private counsel on the first day of trial; 2) the Superior Court abused its discretion by denying a motion for a mistrial made after the prosecutor related in his opening an out-of-court statement by a witness who did not testify; 3) the Superior Court abused its discretion by admitting over defense objection the same out-of-court statement as interpreted and embellished by police officers who did testify at trial; 4) the Superior Court erred as a matter of law by not suppressing cocaine seized by police after they conducted a pat down search of Caldwell without a reasonable and articulable suspicion to conduct the pat down search; 5) the State presented insufficient evidence to show that Caldwell possessed cocaine with the intent to deliver; and 6) the Superior Court abused its discretion by denying a motion for a mistrial after the prosecutor expressed his "opinion" by vouching for the credibility of two police officers and by denigrating the credibility of the sole defense witness with no basis in fact for doing so.

The State denies that any error or abuse of discretion occurred, but if so, any errors were harmless and did not so prejudice Caldwell that a new trial would be required.

We conclude that the Superior Court abused its discretion when it denied the motion for a mistrial at the conclusion of the State's case based upon the prosecutor's improper representation of an out-of-court statement made by a witness who did not testify. Moreover, allowing that statement and further embellishment of that statement to justify a confrontation with Caldwell and a pat-down search of his person which resulted in admitting drugs into evidence constituted plain error.

Therefore, we **REVERSE** the judgment of the Superior Court and **REMAND** for a new trial.

I

On June 19, 1998, Dover Police Officers Anthony DiGirolomo and Todd Case received information from Detective Humphrey[1] of the Dover Police Department that they interpreted to mean that Caldwell "probably had been involved in some type of drug dealing" in the vicinity of 456 East Water Street, an area known for drug activity. DiGirolomo and Case arrived at 456 East Water Street, a residence, and approached Caldwell sitting alone on the front steps. They ordered him to stand up. Case told Caldwell that they had information that he probably had been involved in some type of drug dealing. Caldwell replied that he had not been. Case then asked Caldwell to turn around, face a wall and place his hands on top of his head. DiGirolomo began a pat down search of Caldwell. He asked Caldwell if he had anything hidden in his groin area. Caldwell replied no. DiGirolomo testified that as he moved up Caldwell's legs, he detected what felt like hard ob-

---

1. As will be discussed, *infra,* the prosecutor led the jury to infer that the actual words related were that "Corey Caldwell, was in front of 456 E. Water Street and he had in possession what was reported to be a fairly large amount of cocaine."

jects in a plastic bag in Caldwell's groin area.

At trial, DiGirolomo testified that:

[b]ased on the information that we received, we decided to do a pat-down on Mr. Caldwell who was seated there. We told Mr. Caldwell to stand up. At that time, he was ordered by Officer Case to interlock his hands over top of his head.... I asked him if he had anything hidden in his groin area before I patted him down. He stated no. I started from the ankles up. When I got to his groin area with my right hand— Case was directly behind him, I was to his side, approximately, basically right on top of him. I started to pat him down. I felt hard objects which appeared to be in a plastic bag that was located in his groin. I felt that. I indicated to Officer Case, I said, "I think I got it." [2]

After DiGirolomo felt the object in Caldwell's pants, Caldwell attempted to break away from the officers and flee. Both DiGirolomo and Case testified that Caldwell pulled a plastic bag from his pants and threw it on the ground. The officers retrieved the bag, which contained a yellow-white, rocklike substance that resembled crack-cocaine broken up into several small pieces. A field test identified the substance as crack-cocaine and a later laboratory test confirmed that the substance was 4.39 grams of crack-cocaine. During the search, the officers also discovered a pager and $290 in cash in Caldwell's pants' pocket. The Officers found no paraphernalia that Caldwell could use to smoke, inject or ingest the cocaine.

Caldwell's aunt was the only defense witness to testify at trial. She testified that she was inside 456 East Water Street when DiGirolomo and Case arrived. She stated that she heard a group of men who had been outside of the house scatter when the two officers arrived. She remained in the house until she heard a banging outside against the house. She testified that she went outside and saw DiGirolomo and Case holding Caldwell against the house searching him. She testified that the officers did not take anything from Caldwell but rather picked up a bag lying on the ground nearby.

## II

Caldwell argues that the trial court abused its discretion by denying a motion for a mistrial that the defense made immediately after the State's case-in-chief. The prosecutor had referred in his opening to a statement made by Humphrey to DiGirolomo and Case that Caldwell possessed a "fairly large amount of cocaine." After observing that the prosecutor did not call Humphrey during the State's case-in-chief, Caldwell argued that the State's maneuver denied him the opportunity to cross-examine Humphrey on "facts" that were relevant to an important element of the most serious offense with which he stood charged—possession with intent to deliver. The prosecutor clearly referred to Humphrey's information in a way that both implicated Caldwell individually and implied that he possessed cocaine, in "a fairly large amount," at a location that would later be described as a "drug vicinity." The decision not to call Humphrey prevented Caldwell from examining him about his source of information or the basis for anyone to believe that the information might be true.

During his opening statement, the prosecutor stated:

On June 19th, this year, two officers of the Dover City Police Department...

2. Appx. to Appellant's Op. Br. at A–8—A–9.

received information from another officer..., that was Detective Humphrey, that the defendant, Corey Caldwell, was in front of 456 East Water Street and he had in possession what was reported to be a fairly large amount of cocaine.

The two officers reported to East Water Street, and the description they had been given is there would be a black man wearing dark pants, black T–Shirt and a white hat. When they got there, they saw a man fitting this description, and also said it would be Corey Caldwell.... [3]

The State concedes in its brief that the prosecutor's statement related hearsay but argues that the comment was not "testimony of a witness" but merely the statement of an attorney. The State argues that a curative instruction given by the Superior Court, one which instructed the jury that attorney comments are not to be considered as evidence, eliminated any unfair prejudice that the suggestion in the statement may have caused. The State further argues that because Caldwell waited to object to the Humphrey statement in the opening until the State completed its case-in-chief rather than when it was made, Caldwell must show actual prejudice.

■ This Court uses a two-step analysis to review the argument that the prosecutor made improper statements during argument. The first step is to determine whether the prosecutor's remarks were improper. The second step is to determine whether any improper remarks prejudiced the rights of the defendant. This second step requires an inquiry into "the closeness of the case, the centrality of the issue affected by the (alleged) error, and

the steps taken to mitigate the effects of the error." [4] In addition, in order to constitute plain error, the State's improper comments must "be so clear and defense counsel's failure to object so inexcusable that a trial judge ... has no reasonable alternative other than to intervene *sua sponte* and declare a mistrial or issue a curative instruction." [5]

■ Since the objection, however understandably so, came long after the alleged improper statement was made, we examine whether this prosecutor's statement actually prejudiced Caldwell. In this case, the outcome of the case was close because of the factual dispute about whether Caldwell actually possessed cocaine; and, more importantly, any intent to deliver it. The conflict on this central issue in the case began when the prosecutor introduced the suggestion that Humphrey had informed DiGirolomo and Case that Caldwell possessed a "fairly large amount of cocaine." The prosecutor could not fairly state in his opening that Humphrey's out-of-court statement related information that Caldwell possessed a fairly large amount of cocaine when that fact is central to the case, disputed and the source quoted in the opening statement will not be called and subjected to cross-examination. The import the jury may place upon the out-of-court statement can not be minimized when it has been reputed to be a fact known to a police officer and vouched for as such by a Deputy Attorney General at the opening of the trial. This is particularly true when the declarant is under the control of the State and the State does not call him at trial. A generalized "curative" instruction that says little

---

3. Appx. to Appellant's Op. Br. at A–3.

4. *Hughes v. State*, Del.Supr., 437 A.2d 559, 571 (1981) (quoting *Dyson v. U.S.*, D.C.App., 418 A.2d 127, 132 (1980)).

5. *Trump v. State*, Del.Supr., 753 A.2d 963, 964–965 (2000).

more than that an attorney's statement is not evidence fails to focus on the specific prejudice created by the prosecutor's introduction of Humphrey's out-of-court statement in his opening. The disarmingly misleading effect upon the jury was later compounded by the officers on the scene testifying that they interpreted the statement by Humphrey, even if related accurately by the prosecutor, to mean that Caldwell "had been involved in some type of drug dealing." This opening scenario denied Caldwell's Sixth Amendment right to be confronted by and to cross-examine his accuser. This Sixth Amendment violation prejudiced Caldwell when considered in conjunction with later events because it denied him the opportunity to test the source and accuracy of critical information that led to his confrontation with the police and the credibility of the person relating it on issues of fact and law touching upon elements of the major offense for which he stood charged. The following events which occurred during the State's case in chief underscore the unfair prejudice to Caldwell.

### III

Caldwell argues that the Superior Court compounded the earlier error by improperly allowing the State to question DiGirolomo and Case about the information they received from Humphrey. On direct examination, DiGirolomo testified that "[b]ased on the information that we received, we decided to do a pat-down on Mr. Caldwell...." [6] Case testified that "I indicated to Mr. Caldwell that I had received information that he probably had been involved in some type of drug dealing." [7] This statement elevates Humphrey's professed statement that Caldwell possessed "a fairly large amount of cocaine" to the very inferences the State wished the jury to draw from that hearsay: (a) he in fact possessed cocaine and with the intent to deliver it, though he, by his plea and through his aunt in her testimony denied even simple possession; and, (b) that the amount seized was consistent with dealing.

Caldwell objected to these officers' testimony as a violation of his Sixth Amendment right to cross-examination and later moved for a mistrial. The Superior Court denied the motion after concluding that DiGirolomo and Case did nothing more than substantially corroborate Humphrey's out-of-court statement related by the prosecutor. The State now argues that the prosecutor did not elicit hearsay evidence from DiGirolomo and Case because the prosecutor offered neither his comment nor the officers' testimony to show the truth of either the inference that Caldwell "had been involved in some type of drug dealing" or that he "possessed a fairly large amount of cocaine" but simply to show why the officers went to 456 East Water Street. The State also argues that neither officer related what Humphrey actually said to them nor purported to repeat the substance of their conversation with him.

■ The Humphrey statement advanced by the prosecutor in the opening and the DiGirolomo/Case statements on the stand, presumably relating its meaning to them, could under other circumstances be considered insignificant because they might simply serve to explain why police officers arrive at a particular location. In this case, however, these statements serve more than just to explain why DiGirolomo and Case went to 456 East Water Street. They are the only evidence that create the inference that the police had a reasonable

6. Appx. to Appellant's Op. Br. at A–8.

7. Appx. to Appellant's Op. Br. at A–17.

belief or articulable suspicion that Caldwell was or had been engaged in criminal activity. The State's contention that the statements were not offered for their truth is an argument made out of whole cloth. Without the out-of-court statement of Humphrey introduced by the prosecutor in his opening and its transformation into something even more telling by the officers' testimony about its meaning to them, the State's argument that Caldwell possessed cocaine with the intent to deliver turns on whether the jury would believe Caldwell's aunt or the officers' observations at the scene. Further, even if the jury were to be more likely to believe the officers at the scene about the details of the confrontation, Humphrey's untested out-of-court statement's reference to quantity, vouched for by the prosecutor and embellished by the officers at the scene into being consistent with "drug dealing," could not be fairly segregated by the jury from their consideration of whether he possessed cocaine with the intent to deliver it. We are convinced that the prejudice caused by admitting Humphrey's out-of-court statement through the opening statement and again through the repetition and embellishment of the statement at trial through the testimony of the officers at the scene denied Caldwell a fair trial.

## IV

◼ Caldwell's argued trail of prejudicial errors continues with the Superior Court's failure to declare a mistrial after the prosecutor expressed his personal opinion during closing argument by vouching for the credibility of DiGirolomo and Case and by improperly undermining the credibility of Caldwell's aunt, the sole defense witness.[8] Because Caldwell made no objection at trial to the prosecutor's statements, we review for plain error.[9]

During closing argument, the prosecutor stated:

> You have heard from two officers of the Dover City Police Department in the State's case-in-chief. Both of them are experienced officers. They really have no motive to lie here. They are just doing their job. They show up, they find this and come in and tell you about it.
>
> On the other hand, you heard from the defendant's aunt. Now, you know, she's known this guy since he was a baby. She told you that she watched him, that she tried to keep him out of trouble when he was a kid. She told you she doesn't want to see anybody get in trouble. Certainly, the State suggests, her heart is in the right place, but her feelings for the defendant certainly cloud her memory and her perception of what went on.[10]

Caldwell argues that these statements are improper because they reflect the prosecutor's personal opinion about the credibility of witnesses. The State argues that the prosecutor's statements during

---

8. Caldwell also contends that the prosecutor impermissibly used the term "I" during closing argument. For example, the prosecutor stated, "as I told you in the opening" and "I'm just going to go through the charges briefly." Appx. to Appellee's Op. Br. at B–16. Although this court strongly discourages the use of the term "I" in closing arguments, *see Brokenbrough v. State*, Del.Supr., 522 A.2d 851, 859 (1987), there is no rule that the use of the term "I" is *per se* improper. *See Trump v. State*, Del.Supr., 753 A.2d 963, 968 (2000). In this case, because the prosecutor's use of the term "I" came only in introductory phrases and did not indicate a personal endorsement of particular testimony, the statements were not improper.

9. Del.Supr. Ct. R. 8; *see McDade v. State*, Del.Supr., 693 A.2d 1062, 1064 (1997).

10. Appx. to Appellant's Op. Br. at A–25.

closing argument were not improper and denies that the prosecutor attempted to vouch for the credibility of DiGirolomo and Case. Moreover, the State argues that Caldwell has not shown unfair prejudice.

Prosecutors may not comment on the truth of testimony or credibility of witnesses.[11] This general rule includes a specific prohibition against vouching for the credibility of the State's witnesses such as stating or implying personal knowledge of the truth of their testimony "beyond that logically inferred from the evidence presented at trial."[12] In this case, the prosecutor told the jury that DiGirolomo and Case "are experienced officers" and that "[t]hey really have no motive to lie here. They are just doing their job. They show up, they find this and come in and tell you about it."[13] Although these statements are arguably improper because they imply that the officers' testimony is accurate, they do not contain a personal endorsement of the officers and they do not imply that police officers *always* testify truthfully.[14]

Prosecutors must also refrain from implying that a defense witness is lying unless (1) the jury may legitimately infer from the evidence that the witness lied and (2) the "prosecutor relates his argument to specific evidence which tends to show that the testimony or statement is a lie."[15] In this case, the prosecutor argued that Caldwell's aunt "doesn't want to see anybody get into trouble" and that "her feelings for the defendant certainly cloud her memory and her perception of what went on."[16] The prosecutor in this case certainly could argue that Caldwell's aunt was biased provided there was evidence to support that inference. To suggest that bias would "cloud her memory and her perception of what went on" and to imply that she "tried to keep him out of trouble," does not alone constitute an impermissible suggestion that she lied under oath.

Assuming *arguendo* that even if all or some of the prosecutor's statements above were improper, the next step is to determine whether the State's improper statements prejudiced Caldwell and constituted plain error. Applying the prejudice analysis in *Hughes*, the outcome of the case was close and the jury had to resolve the central credibility issue involved in the conflicting testimony of DiGirolomo, Case and Caldwell's aunt. In addition, the Superior Court did not immediately issue a curative instruction. This analysis raises a serious question that the prosecutor's statements may have affected the jury, the outcome of the case and therefore unfairly prejudiced Caldwell.

While we must caution a prosecutor against any predilection to overreach in an endorsement of police credibility and to exercise care in decrying the credibility of a defendant's witness, the prosecutor's actions in this case can not be said to have unfairly prejudiced Caldwell and therefore do not constitute plain error.

11. See *Brokenbrough v. State*, Del.Supr., 522 A.2d 851, 855 (1987).

12. *Saunders v. State*, Del.Supr., 602 A.2d 623, 624 (1984).

13. Appx. to Appellant's Op. Br. at A–25.

14. But *cf. Miller v. State*, Del.Supr., No. 434, 1998, Hartnett, J. (Feb. 16, 2000) (reversing in part because the State improperly asked the jury whether "[a] man who has dedicated his life to enforcing the law would come in here and lie to you in some effort to point the finger at the wrong person").

15. *Hughes*, at 571.

16. Appx. to Appellant's Op. Br. at A–25.

## V

Caldwell argues that the Superior Court erred by not suppressing the cocaine DiGirolomo and Case seized during the pat down search. He contends that the officers used the pat down search as a pretense to search for drugs, which violated his Fourth Amendment right against unreasonable search and seizure.

The State argues that there was no error in admitting the cocaine because DiGirolomo and Case, in fact, retrieved the cocaine from the ground after Caldwell threw it down and abandoned it, placing the cocaine in plain view. The State acknowledges, however, that the search may have exceeded the scope of a permissible pat down search had the officers seized the cocaine from Caldwell's person. The State insists, nevertheless, that DiGirolomo and Case had a reasonable and articulable suspicion to confront Caldwell and conduct a pat down search based on the information they received from Humphrey.

The State contends that Caldwell should have filed a motion to suppress and demanded a hearing if there were a question about the admissibility of the cocaine seized during the search. Caldwell's defense that he never possessed cocaine drove the tactical decision not to pursue a motion to suppress. Because Caldwell neither filed a pre-trial motion to suppress nor objected at trial to the admission of the cocaine, we review for plain error.[17]

 Our analysis begins by determining whether DiGirolomo and Case conducted a lawful pat down search of Caldwell. Generally, warrantless searches are presumed invalid. There are few exceptions.[18] One exception is the pat down search permitted under *Terry v. Ohio*.[19] This exception permits a police officer, after observing "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," to stop and briefly detain the person in order to make "reasonable inquiries" aimed at confirming or dispelling any suspicions.[20] Furthermore, when circumstances give the officer justification to believe that the individual is armed and presently dangerous, the officer may conduct a pat down search of that person for weapons.[21] The test for the justification of the search is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."[22] In this case no one contends that possession of a weapon is in issue.

 A pat down search may not rest on a "generalized suspicion" alone.[23] The search must be founded upon a "reasonable suspicion," which is defined as "the officer's ability to point to *specific* and *articulable facts*, which, taken together with all rational inferences from those facts, reasonably warrant the intrusion."[24] And "[a]lthough we give due deference to an officer's experience and knowledge, the facts which form the basis of the reasonable suspicion must 'be capable of measurement against an objective stan-

17. Del.Supr. Ct. R. 8; *see McDade v. State*, Del.Supr., 693 A.2d 1062, 1064 (1997).

18. *See Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

19. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

20. *Id.* at 30, 88 S.Ct. 1868.

21. *Id.* at 24, 88 S.Ct. 1868.

22. *Id.* at 27, 88 S.Ct. 1868.

23. *Id.* at 10, 88 S.Ct. 1868.

24. *Id.* at 9, 88 S.Ct. 1868 (emphasis in original).

dard.' " [25] It is important that police have an articulable suspicion appropriate to the circumstances.[26] In *Jones v. State* [27] this Court found that the State incorrectly distinguished the officers' safety exception from the need for an articulable suspicion.[28] " '[O]fficer safety,' at least on this record, does not obviate the court's obligation to assess independently the legality of the officer's action." [29] This Court in *Jones* agreed with the Seventh Circuit that "while officer safety is 'both legitimate and weighty,' it cannot in all circumstances justify a search or seizure. Otherwise nearly any invasion of a person's privacy could be justified by arguing that the police needed to protect themselves from harm." [30]

▪ In this case, the record shows no evidence that the officers on the scene actually observed Caldwell engage in any unusual conduct that led them to reasonably conclude in light of their experience that criminal activity was afoot. The officers testified that they saw Caldwell sitting alone on the front steps of 456 East Water Street, a residence, when they approached him. He was not "abroad" as that term has come to be interpreted. There is no evidence that the officers asked Caldwell whether he possessed a weapon. There is no evidence that Caldwell was hostile [31] or that the officers faced a large number of people.[32] The record reflects no circumstance that would give the officers justification for believing that Caldwell was armed and presently dangerous. In fact, the officers' testimony resolves any question that the officers conducted the pat down search for drugs alone. Indeed, while conducting the pat down search, DiGirolomo stated "I think I got it" after he felt what he thought to be a package of drugs. He did not state that he thought the object he felt was a weapon. In sum, DiGirolomo and Case pointed to no specific and articulable facts, which, taken together with all rational inferences from those facts, reasonably warranted the intrusion.

If DiGirolomo and Case lacked justification to conduct a pat down search of Caldwell, the search was invalid and the seized cocaine is inadmissible. Assuming, however, that the officers had justification to conduct a pat down search, they must have first detained Caldwell pursuant to the requirements of 11 *Del. C.* §§ 1902 [33]—1903.[34] Although Caldwell does not argue

**25.** *Robertson v. State*, Del.Supr., 596 A.2d 1345, 1350–1351 (1991) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

**26.** *See Knowles v. Iowa*, 525 U.S. 113, 119, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998).

**27.** Del.Supr., 745 A.2d 856 (1999).

**28.** *Id.* at n. 78.

**29.** *Id.*

**30.** *Id.* (citing *U.S. v. Johnson*, 170 F.3d 708, 718 (1999)) (citations omitted) (quoting *Knowles v. Iowa*, 525 U.S. 113, 119, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998)).

**31.** *See Hicks v. State*, Del.Supr., 631 A.2d 6, 10 (1993).

**32.** *See Robertson v. State*, Del.Supr., 596 A.2d 1345, 1352 (1991).

**33.** 11 *Del. C.* § 1902 states in pertinent part: "(a) A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination."

**34.** 11 *Del. C.* § 1903 states in pertinent part: "A peace officer may search for a dangerous weapon any person whom he has stopped or detained to question as provided in § 1902 of this title, whenever he has a reasonable ground to believe that he is in danger if the person possesses a dangerous weapon."

that his detention was illegal or that he was even simply detained, it is nonetheless important to examine whether the officers possessed a reasonable and articulable suspicion to seize Caldwell and detain him in accordance with §§ 1902—1903. Only after satisfying the requirements of §§ 1902—1903 could DiGirolomo and Case conduct a pat down search of Caldwell.

Under 11 *Del. C.* § 1902(a), an officer "may stop any person abroad, or in a public place, who he has a reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and where he is going." In *Hicks v. State*,[35] this Court stated that "[t]he purpose of § 1902 was to legalize the questioning and detention of persons without probable cause where the *express criteria* of the section were met. Where, however, there is no reasonable basis to suspect the detainee had committed, was committing, or was about to commit a crime, any detention of that defendant is unlawful."[36]

In *Jones v. State*, this Court held that in order to stop and detain an individual pursuant to the Delaware detention statute and the Delaware Constitution, a peace officer must have a reasonable and articulable suspicion of criminal activity. In *Jones*, this Court reversed the judgment of the Superior Court, finding that evidence had been invalidly seized from the defendant, Jones. The seizure resulted from an encounter with a police officer in which the officer, based only on an anonymous 911 call that there was a "suspicious black male wearing a blue coat" in a particular area, ordered Jones, who fit the description, to stop and remove his hands from

his pockets. Jones did not comply with this command; instead, Jones turned and walked away. The officer once again commanded Jones to remove his hands from his pockets. When Jones again did not comply, the officer attempted to remove Jones' hands from his pockets. The officer and Jones began to struggle during which Jones threw over his head a small bag of cocaine that the officer later retrieved.

In *Jones*, this Court focused on when Jones' detention occurred under 11 *Del. C.* 1902. The Court concluded that Jones had been detained when the officer ordered him to stop and remove his hands from his pockets because a reasonable person would believe that he would not be free to go and to ignore the police presence. "The reasonableness of [the officer's] suspicion must rest on the facts known to him at the time he ordered Jones to stop."[37] This Court concluded that "Jones' actions in walking away from police and his refusal to obey ... the officer's commands ... did not furnish grounds for reasonable and articulable suspicion to effect the seizure."[38]

In this case, the question is whether the officers had a reasonable and articulable suspicion to detain or seize Caldwell and conduct a pat down search based on the facts known to them at the time they approached Caldwell as he sat alone on the front steps of the residence at 456 East Water Street. The officers seized Caldwell when they ordered him to stand up, turn around, place his hands on top of his head and face the wall. Given these commands, no reasonable person would think that he could ignore them and walk away.

---

**35.** Del.Supr., 631 A.2d 6 (1993).

**36.** *Id.* at 9 (citations omitted) (emphasis in original).

**37.** *Jones,* at 863.

**38.** *Id.* at 869.

The State contends the officers possessed a reasonable and articulable suspicion based on the information provided by Humphrey. A troubling aspect of this case, however, is that Humphrey did not testify. No evidence indicated the source, reliability or accuracy of Humphrey's purported information. What is plain is that Humphrey himself had no personal knowledge of the facts he purportedly related to Case and DiGirolomo. The prosecutor's statement to the jury of what the prosecutor believed Humphrey told DiGirolomo and Case differs from the officers' trial testimony about what they understood Humphrey to have said. Without Humphrey's out-of-court statement, there is no indication in the record that Caldwell had committed or was about to commit any criminal activity. The officers' own observations "added nothing to" Humphrey's statements and "did not corroborate or particularize" Humphrey's statements except to find Caldwell present, alone and on residential steps.[39] In fact, the only testimony about the information Humphrey relayed to the officers, the State contends, was not offered for its truth.[40] The flawed nexus between DiGirolomo and Case's information and a reasonable belief that Caldwell possessed cocaine has its genesis in the out-of-court statement by Humphrey. Despite the State's contention that the officers seized the cocaine in plain view there can be no question even under the State's theory that the initial confrontation with Caldwell directly caused the disgorgement of the cocaine later retrieved. Based on the record, we conclude that the State failed to show that DiGirolomo and Case had a reasonable and articulable suspicion to seize Caldwell and conduct a pat down search pursuant to the requirements of §§ 1902—1903.

Because DiGirolomo and Case had no reasonable and articulable suspicion to confront Caldwell and conduct a pat down search pursuant to the Delaware detention statute, Caldwell suffered actual prejudice when the cocaine was admitted into evidence and we, therefore, hold that the Superior Court committed plain error by admitting the cocaine.

## VI

Caldwell argues that the State failed to produce sufficient evidence to prove beyond a reasonable doubt that he intended to deliver cocaine. At best, he suggests that the State proved simple possession. The State, of course, argues that not only was there sufficient evidence to support a conviction for intent to deliver but also that because Caldwell failed to present this argument to the trial court, we must review this contention for plain error.

At trial, the State's evidence relevant to Caldwell's intent to deliver cocaine was the quantity of the cocaine, the out-of-court statement made by Humphrey about quantity that was reinterpreted by the officers at the scene to mean that Caldwell was "involved in drug dealing," the expert testimony presented by DiGirolomo regarding the typical characteristics of drug dealers and the testimony of Case regarding the street value of the cocaine seized.

During the trial, the jury heard from the prosecutor that Humphrey informed DiGirolomo and Case that Caldwell possessed "a fairly large amount of drugs." Humphrey did not testify, however, nor did the State introduce evidence to show the source, reliability or accuracy of Humphrey's information. DiGirolomo testified about the manner in which drug dealers

---

**39.** *See Jones,* at 870.

**40.** *See* Appellee's Op. Br. at 18.

carry narcotics, and he also testified about paraphernalia that would be carried by those who possess drugs for use alone. DiGirolomo testified that the quantity of drugs found was typical of that carried by a drug dealer and that the lack of paraphernalia for consumption indicated that Caldwell did not carry the drugs for personal use. Case testified, in effect, that the information Humphrey told him, along with the location where they found Caldwell led him to conclude that Caldwell was involved "in some type of drug dealing." Case further testified that the street value of the crack cocaine was approximately $400 and that Caldwell already possessed $290 at the time of the arrest. The State presented no other evidence to show that Caldwell possessed cocaine with the intent to deliver.

The State argues that the totality of the evidence was sufficient to permit a jury to infer that Caldwell intended to sell drugs. The State argues that the (now) "large" quantity of cocaine, the $290 in cash found on Caldwell's person and the absence of any paraphernalia used to smoke or ingest the cocaine support conviction for intent to deliver beyond a reasonable doubt. Moreover, the State argues that because Caldwell's only defense was that the drugs were not his, once a jury determined that the drugs were his, he had no defense against the charge of intent to deliver.

The State cannot establish intent to deliver merely by proving possession of a particular quantity of cocaine,[41] but the State may establish intent to sell "exclusively through circumstantial evidence."[42] The State argues that it presented enough circumstantial evidence to permit the jury to infer that Caldwell intended to deliver drugs. But an important piece of evidence from which to draw that inference comes from the out-of-court statement of Humphrey, a hearsay statement that reflected no personal knowledge on his part. Since this hearsay statement is buttressed by the dubious interpretation supplied by Case, we conclude that it is more likely than not that the jury placed considerable weight on these inappropriately admitted statements. Considered with the prosecutor's arguable vouching for the testimony in closing, this raises considerable doubt about the fairness of the outcome of Caldwell's trial. Because it is unclear how much weight the jury actually placed on the out-of-court statement by Humphrey as related by the prosecutor and then embellished by later testimony and the fact that Caldwell could not cross-examine Humphrey, we lack confidence in the fairness of Caldwell's trial. Accordingly, his sentence must be reversed.

## VII

Caldwell sought private counsel on the day of the trial. Caldwell claims that he requested a continuance to allow time for his counsel to prepare, but the Superior Court denied his request. The docket does not indicate that a request was made. Because we have determined that Caldwell should receive a new trial in any event, we need not address Caldwell's argument that the Superior Court abused its discretion by denying his request for a continuance.

### Conclusion

The Superior Court abused its discretion by denying Caldwell's motion for a mistrial at the conclusion of the State's case and by allowing the out-of-court statement by Humphrey to be buttressed at trial by the officers at the scene. Admission of the

41. *See Malloy v. State*, Del.Supr., 462 A.2d 1088, 1091 (1983).

42. *Davis v. State*, Del.Supr., 706 A.2d 523, 525 (1998) (citing 11 *Del. C.* § 307(a)).

drugs after a confrontation with and pat-down of the defendant by the police in the absence of a reasonable, articulable suspicion that Caldwell possessed drugs prejudiced Caldwell, raises doubt about the fairness of the outcome and constitutes plain error. Accordingly, we **REVERSE** and **REMAND** for a new trial.