Jose LOPEZ–VAZQUEZ, Defendant
Below–Appellant,

v.

STATE of Delaware, Plaintiff
Below–Appellee.

No. 547, 2007.

Supreme Court of Delaware.

Submitted: July 9, 2008.
Decided: Aug. 29, 2008.

**1282**

Santino Ceccotti, Esquire (argued), Office of the Public Defender, Wilmington, DE, for appellant.

Timothy J. Donovan, Jr., Esquire (argued), Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, JACOBS, and RIDGELY, Justices.

RIDGELY, Justice:

Defendant–Appellant Jose Lopez–Vazquez appeals his convictions, following a Superior Court jury trial, of various drug charges. He argues that the trial judge erred in denying his motion to suppress evidence found as a result of what he asserts was an illegal stop that violated his Fourth Amendment rights. Specifically, Lopez–Vazquez contends that the police lacked reasonable suspicion to seize him when they did, thereby tainting the subsequent consent he gave to a search of his vehicle that resulted in the seizure of cocaine. We conclude that the Superior Court erred in denying the motion to suppress. Accordingly, we reverse.

### I. Facts

Detective Hector Cuadrado received a tip from a past-proven reliable confidential informant that "Popi Chulu," later identified as Julio Polanco–Lugo, was selling drugs in the city of Wilmington, Delaware. Police began to mount an investigation of Polanco–Lugo, including setting up two controlled purchases. After the first controlled purchase, police observed the seller and followed his Dodge Caravan as the seller met with other subjects and engaged in what police believed were other drug sales. They also followed the car back to the 3900 block of Lancaster Avenue, Lancaster Court Apartments, where they saw

the driver enter Building 3914, an multiunit apartment building.

Eleven days later, police set up a second controlled purchase. During surveillance at 3914 Lancaster Avenue, police observed the same Dodge Caravan parked in front of the apartment building. They also observed a green Dodge Stratus pull in front of 3914 Lancaster Avenue and park. Detective Cunningham, who had seen the seller during the first controlled buy, noted that the driver of the Dodge Stratus was the same person (Polanco–Lugo). Detective Cunningham set up a second controlled purchase and went to meet the seller. Detective Cuadrado remained behind, and saw Polanco–Lugo get into the Dodge Stratus. Although Detective Cuadrado began to follow Polanco–Lugo, Detective Cunningham told him to return to set up surveillance at 3914 Lancaster Avenue.

After Detective Cuadrado set up surveillance, he saw a green Saab pull up and park on the southeast corner of Court Drive and Lancaster Avenue. The driver of this car, later identified as Lopez–Vazquez, walked over to and stopped in front of 3914 Lancaster Avenue. Lopez–Vazquez was unknown to the police and was not a target of the investigation. Detective Cuadrado watched Lopez–Vazquez talk for about fifteen minutes with another man, who had independently arrived on the scene, while standing in front of the steps of the front entranceway of the apartment building. That man was Michael Hernandez, who Detective Cuadrado recognized as a subject of an unrelated drug investigation. Based on his experience in drug investigations, Detective Cuadrado testified that the two men appeared to be nervous and anxious, and waiting for someone to return. Dispatch then informed the detective that the driver of the

Dodge Stratus was headed back to the Lancaster Court Apartments.

Detective Cuadrado testified that after the Dodge Stratus arrived and parked, Lopez–Vazquez and Hernandez reacted in a way that led him to believe that the driver was the person for whom the men had been waiting. He saw Polanco–Lugo approach Hernandez and Lopez–Vazquez. Hernandez was positioned on the front step of the building, and Lopez–Vazquez was on the ground level. Polanco–Lugo threw the keys "up high" toward Hernandez (who caught them), and then walked away from them. Polanco–Lugo did not speak to Lopez–Vazquez or acknowledge his presence. Hernandez walked into the building. Lopez–Vazquez entered the building after Hernandez. Because they disappeared from sight, Detective Cuadrado explained that he was unable to tell where each went after entering the building. Polanco–Lugo walked into the same building about five minutes later.

While Detective Cuadrado was making these observations, Detective Cunningham had applied for and obtained a search warrant for Polanco–Lugo's apartment. The team arrived to execute the search warrant about an hour after Hernandez and Lopez–Vazquez entered the building. Meanwhile, but after the search warrant had been executed, another officer told Detective Cuadrado that he saw Lopez–Vazquez coming out of the rear of the building and was heading toward the Saab. Detective Cuadrado radioed Detective Silva, who had just arrived on the scene, to approach Lopez–Vazquez and ask what his business was with Polanco–Lugo, since Lopez–Vazquez had been observed with some of the targets that he was investigating.

Detective Silva testified that he walked up to Lopez–Vazquez and asked Lopez–Vazquez if he would speak with him. When Detective Silva did not get an an-

swer, he thought Lopez–Vazquez might speak Spanish, and asked him in Spanish whether he would speak to him. Lopez–Vazquez answered "Sure." They then engaged in a conversation about where Lopez–Vazquez was coming from and what was his name.

Detective Silva testified that Lopez–Vazquez acted nervously during this encounter. Lopez–Vazquez told the detective that he was coming from his apartment, but could not tell him what his apartment number was. He also had his hands in his pocket, which prompted Detective Silva to ask him to take out his hands for safety purposes. When Lopez–Vazquez did that, the detective saw that he had a set of keys with a Saab emblem on them. Although Detective Silva knew that Lopez–Vazquez was facing the green Saab, he asked him whether his car was in that area. Lopez–Vazquez told him that it was, looked at the green Saab, but then pointed toward a different location.

Detective Silva then asked Lopez–Vazquez if he had anything in his possession and whether he could search him. Lopez–Vazquez told Detective Silva that he did not, and then consented to a search. Detective Silva found some money wrapped in plastic, although the significance of this fact was not explained. Based on his answers, demeanor, and the money being plastic-wrapped, Detective Silva testified that he placed Lopez–Vazquez "under arrest, or detained him." He then asked Lopez–Vazquez, who was facing the green Saab, "Are you sure that the car that you're talking about is not the one that you're looking at?" Lopez–Vazquez "lowered his head" and answered yes. When Detective Silva asked if there was anything in that car, Lopez–Vazquez answered "No, there's nothing." He then consented to Detective Silva's request to search the vehicle. A police canine was brought to the scene and provided a positive indication for the presence of drugs in the Saab. The vehicle was towed, and when later searched pursuant to a warrant, police found cocaine in a hidden compartment.

Lopez–Vazquez filed a motion to suppress, claiming that the police did not possess a reasonable and articulable suspicion that he was engaged in criminal activity. In response, the State argued that "the veteran detectives in this case conducted a valid *Terry* stop that was followed by a valid consent by the defendant." The State conceded that Detective Silva had "seized" Lopez–Vazquez during the initial encounter, which raised the issue of whether the detective had reasonable and articulable suspicion to detain him at that point. In a bench ruling, and without the benefit of a transcript, the trial judge denied Lopez–Vazquez's motion. A Superior Court jury convicted him of Trafficking in Cocaine, Possession with Intent to Deliver and Use of a Vehicle for Keeping a Controlled Substance. After sentencing, Lopez–Vazquez filed this appeal.

## II. Discussion

### A. Standard of review on motions to suppress

On appeal, Lopez–Vazquez argues that the trial judge erred in denying his motion to suppress. We review the grant or denial of a motion to suppress for an abuse of discretion.[1] To the extent that

1. *Culver v. State*, 956 A.2d 5, 2008 WL 2987183, at *3 (Del.2008); *Hunter v. State*, 2008 WL 625566, at *2 (Del.Supr.); *Demby v. State*, 2008 WL 534273, at *3 (Del.Supr); *Stewart v. State*, 2008 WL 482310, at *2 (Del. Supr); *Howard v. State*, 2007 WL 2310001, at *2 (Del.Supr.); *Everett v. State*, 2007 WL 1850906, at *1 (Del.Supr.); *Weddington v. State*, 2007 WL 760571, at *3 (Del.Supr.); *Rambo v. State*, 939 A.2d 1275, 1278 (Del.

we examine the trial judge's legal conclusions, we review the trial judge's determinations *de novo* for errors in formulating or applying legal precepts.[2] To the extent the trial judge's decision is based on factual findings, we review for whether the trial judge abused his or her discretion in determining whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous.[3] Where as here, we are reviewing the denial of motion to suppress evidence based on an allegedly illegal stop and seizure, we conduct a *de novo* review to determine whether the totality of the circumstances, in light of the trial judge's factual findings, support a reasonable and articulable suspicion for the stop.[4]

2007); *Ares v. State*, 937 A.2d 127, 130 (Del. 2007); *Sullins v. State*, 930 A.2d 911, 917 (Del.2007); *Cole v. State*, 922 A.2d 364, 371 (Del.2007); *Butcher v. State*, 2006 WL 3392895, at *2 (Del.Supr.); *Herring v. State*, 2006 WL 3062899, at *1 (Del.Supr.); *Bunting v. State*, 2006 WL 2587074, at *4 (Del.Supr.); *Guy v. State*, 913 A.2d 558, 563 (Del.2006); *Donald v. State*, 903 A.2d 315, 318 (Del.2006); *Flonnory v. State*, 893 A.2d 507, 515 (Del. 2006); *State v. Henderson*, 892 A.2d 1061, 1066 (Del.2006); *Roten v. State*, 2005 WL 3526322, at *2 (Del.Supr.); *Harris v. State*, 2005 WL 2219212, at *1 (Del.Supr.); *Cole v. State*, 922 A.2d 354, 358–59 (Del.2005); *Smith v. State*, 887 A.2d 470, 472–73 (Del. 2005); *Wien v. State*, 882 A.2d 183, 188 (Del. 2005); *Garvey v. State*, 873 A.2d 291, 298 (Del.2005); *Ingram v. State*, 2004 WL 2154325, at *1 (Del.Supr.); *Quirico v. State*, 2004 WL 220328, at *5 (Del.Supr.); *Norcross v. State*, 816 A.2d 757, 762 (Del.2003); *McAllister v. State*, 807 A.2d 1119, 1122–23 (Del. 2002); *Caldwell v. State*, 780 A.2d 1037, 1053 (Del.2001); *Hubbard v. State*, 2001 WL 1089664, at *3 (Del.Supr); *Elam v. State*, 2001 WL 46379, at *1 (Del.Supr.); *Virdin v. State*, 780 A.2d 1024, 1030 (Del.2001); *Woody v. State*, 765 A.2d 1257, 1261 (Del.2001); *Negron v. State*, 1999 WL 486916, at *1 (Del. Supr.); *Seward v. State*, 723 A.2d 365, 370 (Del.1999); *Johnson v. State*, 1996 WL 69829, at *1 (Del.Supr.); *Downes v. State*, 1996 WL 145836, at *2 (Del.Supr.); *Richardson v. State*, 673 A.2d 144, 147 (Del.1996); *Hicks v. State*, 631 A.2d 6, 8 (Del.1993); *Liu v. State*, 628 A.2d 1376, 1379 (Del.1993); *Gregory v. State*, 616 A.2d 1198, 1200 (Del.1992); *Kelson v. State*, 1991 WL 165553, at *2 (Del.Supr.); *Alston v. State*, 554 A.2d 304, 308 (Del.1989). *Accord State v. Meades*, 947 A.2d 1093, 1097 (Del.2008) (finding no abuse of discretion in the motion to suppress decision); *Perrera v. State*, 2004 WL 1535815, at *1 (Del.Supr.) (same); *Williamson v. State*, 707 A.2d 350, 359 (Del.1998) (same); *Williams v. State*, 1997 WL 560894, at *1 (Del.Supr.) (same) *Gibbs v. State*, 479 A.2d 266, 271 (Del.1984) (same).

2. *Chavous v. State*, 953 A.2d 282, 2008 WL 2527344, at *3 n. 15 (Del.2008); *accord Culver*, 956 A.2d 5, 2008 WL 2987183, at *3; *Burrell v. State*, 953 A.2d 957, 2008 WL 2427043, at *3 (Del.2008); *Hunter v. State*, 2008 WL 625566, at *2 (Del.Supr.); *Demby*, 2008 WL 534273, at *3; *McDonald v. State*, 947 A.2d 1073, 1082 (Del.2008) (Noble, V.C., dissenting); *Rambo*, 939 A.2d at 1278; *Ares*, 937 A.2d at 130; *Donald*, 903 A.2d at 318; *Flonnory*, 893 A.2d at 515; *Harris*, 2005 WL 2219212, at *1; *Cole*, 922 A.2d at 359; *Smith*, 887 A.2d at 473; *Garvey*, 873 A.2d at 298; *McAllister*, 807 A.2d at 1123; *Hunter v. State*, 783 A.2d 558, 561 (Del.2001); *Virdin*, 780 A.2d at 1030; *Jones v. State*, 745 A.2d 856, 860 (Del.1999); *Downs v. State*, 570 A.2d 1142, 1144 (Del.1990).

3. *Chavous*, 953 A.2d 282, 2008 WL 2527344, at *3 n. 15; *accord Burrell*, 953 A.2d 957, 2008 WL 2427043, at *3; *Hunter*, 2008 WL 625566, at *2; *McDonald*, 947 A.2d at 1082 (Noble, V.C., dissenting); *State v. Rollins*, 922 A.2d 379, 382–83 (Del.2007); *Cole*, 922 A.2d at 371; *Weddington*, 2007 WL 760571, at *3; *Herring*, 2006 WL 3062899, at *1; *Henderson*, 892 A.2d at 1066; *Garvey*, 873 A.2d at 298; *McAllister*, 807 A.2d at 1123; *Hunter*, 783 A.2d at 561; *Virdin*, 780 A.2d at 1030; *Woody*, 765 A.2d at 1261; *Johnson*, 1996 WL 69829, at *1; *Hicks*, 631 A.2d at 8; *Gregory*, 616 A.2d at 1200; *Downs*, 570 A.2d at 1144; *see Meades*, 947 A.2d at 1097; *Butcher*, 2006 WL 3392895, at *2. *See also Guererri v. State*, 922 A.2d 403, 406 (Del.2007) (explaining the "clearly erroneous" standard).

4. *See Rollins*, 922 A.2d at 382 ("Accordingly, this Court reviews *de novo* whether police possessed reasonable articulable suspicion to

## B. Review standard for when a stop takes place and the determination of reasonable suspicion

Determining whether an officer had reasonable and articulable suspicion to conduct the stop requires a threshold finding of when the stop actually took place.[5]

"Under the Fourth Amendment to the United States Constitution, a seizure requires either physical force or submission to assertion of authority."[6] Once the point at which the stop or seizure occurred has been determined (the *Terry* stop), we examine whether at that point the police had

---

stop a person."); *Cummings v. State*, 765 A.2d 945, 948 (Del.2001) ("The threshold of 'reasonable and articulable suspicion' under either constitutional or statutory standards requires the officer to point to specific facts, which viewed in their entirety, accompanied by rational inferences, support the suspicion that the person sought to be detained was in the process of violating the law. The totality of circumstances, as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, must be examined to determine if reasonable suspicion has been properly formulated.") (citation omitted); *Woody*, 765 A.2d at 1263 ("In determining whether reasonable suspicion exists, we must examine the totality of the circumstances surrounding the situation 'as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.' ") (quoting *Jones*, 745 A.2d at 861); *Robertson v. State*, 596 A.2d 1345, 1350–51 (Del.1991) ("Although we give due deference to an officer's experience and knowledge, the facts which form the basis of the reasonable suspicion must be capable of measurement against an objective standard.") (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)) (internal quotation marks omitted). *See also Ornelas v. United States*, 517 U.S. 690, 696–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

5. *See Purnell v. State*, 832 A.2d 714, 719 (Del. 2003) ("To determine whether the stop was proper this Court must first examine the point at which [the defendant] was stopped. Then we must determine whether the officers had reasonable and articulable suspicion at that time to make the stop."); *accord Woody*, 765 A.2d at 1263 ("As a preliminary matter, it is necessary to our analysis to determine when [the defendant] was seized. Law enforcement officers must be aware of the facts constitut-

ing reasonable suspicion before a detention is effectuated.").

"[L]aw enforcement officers are permitted to initiate contact with citizens on the street for the purpose of asking questions." *Woody*, 765 A.2d at 1263 n. 3. Such a consensual encounter does not amount to a seizure and does not implicate the Fourth Amendment. *Id.*; *Quarles v. State*, 696 A.2d 1334, 1337 n. 1 (Del.1997); *accord Ross v. State*, 925 A.2d 489, 494 (Del.2007); *see also infra* note 20; *compare infra* note 21. When the totality of the circumstances demonstrate that the consensual encounter becomes a stop, "[l]aw enforcement officers must have an objective justification for their actions if the individual is detained." *See Woody*, 765 A.2d at 1263 n. 3; *see also Ross*, 925 A.2d at 492.

6. *Rollins*, 922 A.2d at 383 (quoting *Purnell*, 832 A.2d at 719); *Jones*, 745 A.2d at 862; *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Under Article I, § 6 of the Delaware Constitution, a stop occurs at the point "when a reasonable person would have believed he or she was not free to ignore the police presence." *Jones*, 745 A.2d at 869; *accord Rollins*, 922 A.2d at 383; *Purnell*, 832 A.2d at 718–19; *Harris v. State*, 806 A.2d 119, 124 (Del.2002); *Flonnory v. State*, 805 A.2d 854, 857 (Del.2001). We have also noted that a factor to consider as part of the stop analysis is whether a police officer has engaged in "conduct that would communicate to a reasonable person that he or she was not free to ignore the police presence." *Rollins*, 922 A.2d at 383 (quoting *Purnell*, 832 A.2d at 719) (internal quotation marks omitted); *see also Jones*, 745 A.2d at 863 ("By ordering Jones to stop and remove his hands from his coat, Patrolman Echevarria engaged in conduct that would communicate to a reasonable person that he or she was not free to ignore the police presence. The reasonableness of Patrolman Echevarria's suspicion must rest on the facts known to him at the time he ordered Jones to stop.").

a reasonable and articulable suspicion that criminal activity was taking place.[7] Like probable cause, reasonable suspicion is an "elusive concept"[8], but requires "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."[9] In determining whether a *Terry* stop was supported by reasonable suspicion, the courts consider the totality of the circumstances known to the officer at the time of the stop.[10]

■■■ To meet this standard and establish the reasonable and articulable suspicion necessary to survive a motion to suppress, the State must show specific facts "which, when taken together with rational inferences from those facts, reasonably warrant" the stop.[11] Consistent with federal law, we have adopted a two-pronged analysis when assessing the officer's articulation of the facts and his conduct.[12] First, the court must assess the "objective observations and consideration of the modes or patterns of operation of certain kinds of lawbreakers."[13] Second, the court "must consider the inferences and deductions that a trained officer could make which might well elude an untrained person."[14]

■■■ The analysis of these factors is not done in isolation.[15] Nevertheless, it is

7. See *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Jones*, 745 A.2d at 861; 11 *Del. C.* § 1902. This Court has consistently found that 11 *Del. C.* § 1902 represents a codification of the *Terry* principles. See *Jones*, 745 A.2d at 861 (holding that "reasonable ground" in § 1902(a) "has the same meaning as reasonable and articulable suspicion"); *Rollins*, 922 A.2d at 383–84 (reiterating that § 1902 requires the same analysis as *Terry*); accord *Riley v. State*, 892 A.2d 370, 374 (Del.2006); *Harris*, 806 A.2d at 125 n. 20; *Flonnory*, 805 A.2d at 857; *Coleman v. State*, 562 A.2d 1171, 1174 n. 3 (Del.1989).

8. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The "quantum of evidence necessary for reasonable suspicion is less than that which is required for probable cause to arrest." *Coleman*, 562 A.2d at 1174.

9. *Cortez*, 449 U.S. at 417, 101 S.Ct. 690; see also *Coleman*, 562 A.2d at 1174 (" 'Reasonable suspicion' has been defined as the officer's ability to 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.' ") (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868) (brackets in original omitted); accord *Caldwell v. State*, 770 A.2d 522, 531 (Del.2001); *State v. Henderson*, 892 A.2d 1061, 1064 (Del.2006). See also generally *Cortez*, 449 U.S. at 417 n. 2, 101 S.Ct. 690 ("[A]n officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct.").

10. See *Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690.

11. *Riley*, 892 A.2d at 374–75; *Jones*, 745 A.2d at 861; *Quarles v. State*, 696 A.2d 1334, 1337 (Del.1997); *Coleman*, 562 A.2d at 1174; *Terry*, 392 U.S. at 21, 88 S.Ct. 1868.

12. *Quarles*, 696 A.2d at 1338; accord *Riley*, 892 A.2d at 375; *Harris*, 806 A.2d at 126–27. See also *Jones*, 745 A.2d at 861.

13. *Riley*, 892 A.2d at 375 (internal quotation marks and citations omitted); accord *Harris*, 806 A.2d at 126–27; *Quarles*, 696 A.2d at 1338; *Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690.

14. *Riley*, 892 A.2d at 375 (citations omitted); accord *Harris*, 806 A.2d at 127; *Quarles*, 696 A.2d at 1338; *Cortez*, 449 U.S. at 418, 101 S.Ct. 690. See also *Quarles*, 696 A.2d at 1338 ("It logically follows that a pattern of behavior interpreted by an untrained observer as innocent could justify an investigatory stop when viewed by experienced law enforcement agents who are cognizant of current drug trafficking operations.").

15. See *Riley*, 892 A.2d at 375 ("The United States Supreme Court has rejected attempts by the Circuit Courts of Appeal to evaluate and reject 'factors in isolation from each other.' ") (quoting *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)); accord *State v. Rollins*, 922 A.2d 379,

"possible for factors, although insufficient individually, to add up to reasonable suspicion—that is the nature of a totality of the circumstances test. But we think it impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."[16] This Court has consistently explained that a determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances to assess whether the detaining officer had a particularized and objective basis to suspect criminal activity.[17] The totality of the circumstances must be viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with the officer's subjective interpretation of those facts.[18]

▮▮▮▮ A finding of reasonable suspicion is both "somewhat abstract" and "fact specific" and depends on the "concrete factual circumstances of individual cases."[19] "While the police may properly employ hunches to investigate, more is required to detain a citizen in a public place."[20] Put another way, standing alone, an officer's "subjective impressions or hunches" are insufficient for a stop.[21] Similarly, activity such as "leaving the scene upon the ap-

---

384 (Del.2007). In part, the "totality of the circumstances process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Harris,* 806 A.2d at 126 (quoting *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744).

16. *Karnes v. Skrutski,* 62 F.3d 485, 496 (3d Cir.1995), *distinguished on other grounds by Curley v. Klem,* 499 F.3d 199 (3d Cir.2007).

17. *Harris,* 806 A.2d at 126; *Jones,* 745 A.2d at 861. *Accord Rollins,* 922 A.2d at 384; *Riley,* 892 A.2d at 375; *State v. Henderson,* 892 A.2d 1061, 1064–65 (Del.2006); *Backus v. State,* 845 A.2d 515, 517 (Del.2004); *Purnell v. State,* 832 A.2d 714, 719 (Del.2003); *Flonnory v. State,* 805 A.2d 854, 858 (Del.2001); *Woody v. State,* 765 A.2d 1257, 1263 (Del.2001). *See also Cummings v. State,* 765 A.2d 945, 948 (Del.2001) ("The totality of circumstances, as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, must be examined to determine if reasonable suspicion has been properly formulated."); *Robertson v. State,* 596 A.2d 1345, 1350–51 (Del.1991) ("Although we give due deference to an officer's experience and knowledge, the facts which form the basis of the reasonable suspicion must be capable of measurement against an objective standard.") (citation and internal quotation marks omitted); *Cortez,* 449 U.S. at 417–18, 101 S.Ct. 690.

18. *Jones,* 745 A.2d at 861; *see also supra* note 4.

19. *Harris,* 806 A.2d at 126 (quoting *Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

20. *Cummings,* 765 A.2d at 949.

21. *Terry,* 392 U.S. at 27, 88 S.Ct. 1868 ("[I]in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."); *accord United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("The officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. The Fourth Amendment requires some minimal level of objective justification for making the stop.") (internal quotation marks and citations omitted); *Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *accord Woody,* 765 A.2d at 1263 (explaining that "[a]n officer's subjective impressions or hunches are insufficient" to demonstrate reasonable suspicion under the Fourth Amendment) (citing *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581); *Quarles v. State,* 696 A.2d 1334, 1340 (Del.1997) (Veasey, C.J., dissenting) (noting that "[h]unches and subjective impressions of experienced police officers will not suffice" for reasonable suspicion).

proach, or the sighting, of a police officer"[22] or the "refusal to cooperate with an officer who initiates an encounter"[23] cannot be the sole grounds constituting reasonable suspicion.[24] These events, however, may be considered as part of the totality of the circumstances.[25] Other circumstances may also be considered, such as the presence of a defendant in a high crime area,[26] the defendant's "unprovoked, headlong flight,"[27] a defendant "holding a bulge in his pocket that appeared to be either a gun or a large quantity of drugs"[28], a "focused" warning shout of police presence,[29] or a furtive gesture after the officer's approach or display of authority.[30] The officer's subjective interpretations and explanations of why these activities, based on experience and training, may have given him a reasonable suspicion to investigate further are also important, as is the trial judge's evaluation of the officer's credibility.[31] With these principles in mind, we evaluate whether there was a reasonable and articulable suspicion to seize Lopez–Vazquez.

## C. There was no reasonable and articulable suspicion

 At the suppression hearing, the State rested its argument on its contention that "the veteran detectives in this case conducted a valid *Terry* stop that was followed by a valid consent by the defendant." Before both the Superior Court and this Court, the State agreed with the defense that Lopez–Vazquez was "seized" for all relevant purposes when Detective Silva asked if he could speak to him. The doctrine of waiver applies equally to the State as it does to a defendant.[32] Thus, any argument that Detective Silva initiated

22. *Cummings*, 765 A.2d at 949.

23. *Woody*, 765 A.2d at 1264.

24. *Id.*; *Cummings*, 765 A.2d at 949.

25. *State v. Rollins*, 922 A.2d 379, 386 (Del. 2007); *id.* at 386 n. 28 (citing cases).

26. *Id.* at 385–86 (applying the holdings in *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 and *United States v. Johnson*, 212 F.3d 1313, 1316 (C.A.D.C.2000)); *Riley v. State*, 892 A.2d 370, 376 (Del.2006); *Woody*, 765 A.2d at 1265 ("The high crime nature of the area where the detention occurred ... is a 'relevant contextual consideration' in a reasonable suspicion analysis."); *Jones v. State*, 745 A.2d 856, 871 (Del.1999). *See also Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").

27. *Woody*, 765 A.2d at 1265.

28. *Id.* at 1266.

29. *Rollins*, 922 A.2d at 385.

30. *Id.* at 385 (considering the defendant's "insertion and removal of his hand in his pocket when he saw the officer's approaching").

31. *See Purnell v. State*, 832 A.2d 714, 719 (Del.2003) ("Courts will defer to the experience and training of police officers.") (citing *Woody*, 765 A.2d at 1262); *Harris v. State*, 806 A.2d 119, 129 (Del.2002) ("Without a cogent explanation, Harris' seemingly innocent conduct provides no basis for a finding of reasonable suspicion even in the eyes of a reasonable, prudent, and experienced police officer."). *See also supra note 14*; *Harris*, 806 A.2d at 121 ("Lawful and apparently innocent behavior may be 'meaningless to the untrained' but still raise reasonable suspicion of drug trafficking in the eyes of a reasonable, prudent, and experienced police officer.") (citations omitted). Thus, "[i]n some instances ... lawful and apparently innocent conduct may add up to reasonable suspicion if the detaining officer articulates 'concrete reasons for such an interpretation.'" *Id.* (citations omitted).

32. *See State v. Meades*, 947 A.2d 1093, 1094, 1096–97 (Del.2008); Supr. Ct. R. 8. As in *Meades*, we find no compelling reason to invoke review "in the interests of justice." *Id.* at 1096.

a consensual encounter has been waived.[33] Therefore, we are left to determine whether at the point the agreed-upon seizure took place (that is, when Detective Silva approached Lopez–Vazquez), the totality of the circumstances supported the conclusion that the police had reasonable suspicion that Lopez–Vazquez was engaged in criminal activity. We find that they did not.

A review of the record shows that the following events had taken place prior to Detective Silva's approach. Lopez–Vazquez was not known to the police nor was a subject of their investigation of Polanco–Lugo. He had pulled up in a green Saab in front of an apartment building at the same time the police were investigating Polanco–Lugo for drug activity, but after Polanco–Lugo had left the scene. Lopez–Vazquez spoke to Hernandez, a second but unrelated drug suspect, for approximately fifteen minutes. Both Lopez–Vazquez and Hernandez appeared nervous and anxious, behavior which the observing officer considered to be consistent with waiting for someone. But when Polanco–Lugo, the target of the drug investigation, returned, he threw a set of keys specifically to Hernandez before walking away. Contrary to the officer's suggestion that Lopez–Vazquez was waiting for someone, Polanco–Lugo did not speak to Lopez–Vazquez or even acknowledge his presence. Although Lopez–Vazquez entered the building after Hernandez, there is no evidence of where he went or that he was accompanying Hernandez. An hour later, Lopez–Vazquez was seen outside of the building alone.

In its bench ruling, the Superior Court made two factual findings that we must specifically address: (1) the police observed Lopez–Vazquez "make a contact" with Polanco–Lugo and (2) their surveillance revealed that Lopez–Vazquez had met with Polanco–Lugo in Polanco–Lugo's apartment. The parties have not shown us, nor have we found, any evidence in the

33. *See supra* note 5; *see also Meades*, 947 A.2d at 1097 ("Thus, in analyzing the trial court's decision granting the motion to suppress, we accept, without review, its finding that Meades was detained and that § 1902, therefore, was applicable. Under settled law, the police were required to demonstrate a reasonable articulable suspicion of criminal activity.").

For federal cases addressing consensual encounters, see, e.g., *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("[A] a seizure does not occur simply because a police officer approaches an individual and asks a few questions."); *Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam) ("The initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest."); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is wiling to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."); *United States v. Kim*, 27 F.3d 947, 950–51 (3d Cir.1994) (applying a totality of the circumstances approach to determine whether an encounter was consensual); *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir.1999) ("In the present case, it is perhaps best to view the interaction between Scheets and the investigating officers along a continuum of time.... The determination of whether an encounter is consensual and, thus, falls within the third category of police-citizen encounters, is made on the basis of all relevant circumstances."). *See also generally Ross v. State*, 925 A.2d 489, 494 (Del.2007) (holding that "uniformed police officers following a walking pedestrian and requesting to speak with him, without doing anything more, does not constitute a seizure under Article I, § 6 of the Delaware Constitution").

record supporting these findings. To the contrary, Hernandez, not Lopez–Vazquez, was the one observed to "make a contact" with Polanco–Lugo when Polanco–Lugo threw his keys at him. The only later surveillance of Lopez–Vazquez involved seeing him outside the apartment building, not inside it. Because these additional findings are clearly erroneous, they cannot be used to support a finding of reasonable suspicion. Therefore, we must determine whether the remaining factual findings give rise to reasonable suspicion at the time of the stop.

The observed nervous behavior by an unknown person standing next to and conversing with a known drug suspect gave police a "hunch" that the unknown person might be involved with the target of their investigation.[34] Nothing in the record, however, provides concrete reasons why the remainder of the wholly innocent events that occurred before the seizure (for example, entering into a multi-unit apartment building after Hernandez, spotting Lopez–Vazquez outside of the building—and alone—an hour later by himself) combine into a "suspicious conglomeration"[35] which supports a *Terry* stop. We do not find the totality of the circumstances to give rise to the requisite reasonable and articulable suspicion of criminal activity by Lopez–Vazquez required under *Terry* to justify seizing him.

### D. Consent is tainted by the illegal seizure

The absence of a reasonable basis for a Fourth Amendment seizure bears directly upon the validity of Lopez–Vazquez's subsequent consent to search. "If consent is given after an illegal seizure, that prior illegality taints the consent to search"[36] because the primary purpose of the federal exclusionary rule is to deter future unlawful police conduct and safeguard constitutional rights.[37] Notwith-

34. Neither before the Superior Court, nor before this Court did any party argue that the police had reasonable and articulable suspicion to stop Lopez–Vazquez because he was a companion of Hernandez. In examining the "automatic companion" rule under current federal law, the Superior Court has determined the rule has been defunct under federal law since *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), and at least four circuits have since rejected it. *See State v. Henderson*, 906 A.2d 232, 236–37 (Del.Super.Ct.2005) (citing cases and also noting that the Third Circuit and the District Court of Delaware had not weighed in on it), *aff'd on alternate grounds*, 892 A.2d 1061 (Del.2006). The Superior Court rejected the automatic companion rule as a matter of state constitutional law and noted that the automatic companion rule would run counter to the underlying principles of the totality of the circumstances approach used for stops. *See id.* at 238–46, *see also id.* (appendix to opinion) at 246–48. This Court has not decided the issue, and we will not do so here. *See State v. Henderson*, 892 A.2d 1061, 1064 (Del. 2006) ("We are not asked to, and therefore we do not, rule on the constitutionality of the 'automatic companion rule.' "); *Hunter v. State*, 783 A.2d 558, 561–62 (Del.2001) ("While the trial judge's decision arguably relied primarily on the automatic companion rule, our conclusion in this case does not rest on that rule.").

35. *Karnes,* 62 F.3d at 496; *supra* note 16.

36. *United States v. Richardson,* 949 F.2d 851, 858 (6th Cir.1991); *see Florida v. Royer,* 460 U.S. 491, 507–08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("Because we affirm the Florida Court of Appeal's conclusion that Royer was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the illegality and was ineffective to justify the search.").

37. *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *accord Dorsey v. State,* 761 A.2d 807, 819 (Del.2000); *Jones v. State,* 745 A.2d 856, 873 (Del.1999). The "fruit of the poisonous tree" doctrine has been applied to violations of the Fourth, Fifth, and Sixth Amendments. *See*

standing this purpose, taint may be purged and the evidence may be admissible through one of the doctrinal exceptions to the exclusionary rule,[38] such as the independent source doctrine,[39] the inevitable discovery doctrine,[40] the exigent circumstances doctrine,[41] and the attenuation doctrine.[42]

**38.** The exclusionary rule does not apply to the "collateral sources" doctrine, which permits the government to use illegally obtained evidence in contexts outside of that specific case. *See United States v. Janis,* 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (federal civil tax proceedings); *Stone v. Powell,* 428 U.S. 465, 493, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (*habeas* proceedings); *United States v. Calandra,* 414 U.S. 338, 349–52, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (grand jury proceedings); *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1050, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (civil deportation proceedings); *Pa. Bd. of Prob. v. Scott,* 524 U.S. 357, 364, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (parole revocation proceedings); *United States v. Torres,* 926 F.2d 321, 324–25 (3d Cir.1991) (sentencing hearings); *Michigan v. Harvey,* 494 U.S. 344, 346, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (impeaching defendant's testimony given on direct examination); *United States v. Havens,* 446 U.S. 620, 627–28, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (impeachment during cross-examination provided that the defendant's testimony reasonably opened the door to the prosecutor's questions); *but see James v. Illinois,* 493 U.S. 307, 314, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990) (prosecution cannot use illegally obtained evidence to impeach witnesses other than the defendant). The United States Supreme Court has also held that the exclusionary rule does not render inadmissible evidence discovered subsequent to a violation of the "knock and announce" rule in the execution of a search warrant. *See Hudson v. Michigan,* 547 U.S. 586, 602, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006).

**39.** *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Segura v. Unit-*

*Nix v. Williams,* 467 U.S. 431, 442, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (citing cases). *See also Brown v. State,* 947 A.2d 1062, 1072 (Del.2007) (noting that there is an open question of whether the "fruits of the poisonous tree" doctrine still applies to Sixth Amendment violations after *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), but not reaching the issue).

*ed States,* 468 U.S. 796, 805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Costello v. United States,* 365 U.S. 265, 280, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *see generally Jones,* 745 A.2d at 873 ("[T]he United States Supreme Court has found exceptions to this rule in situations where the police had an independent source for the evidence untainted by their misconduct. ...").

**40.** *Murray,* 487 U.S. at 539, 108 S.Ct. 2529, *Nix,* 467 U.S. at 444, 104 S.Ct. 2501; *accord Cook v. State,* 374 A.2d 264, 267–68 (Del. 1977); *see also Jones,* 745 A.2d at 873 ("We have held that official misconduct should not fatally taint evidence that would have been discovered absent that official misconduct.").

**41.** *See Guererri v. State,* 922 A.2d 403, 406 (Del.2007); *accord Blake v. State,* 954 A.2d 315, 2008 WL 2520873, at *2 (Del.2008).

**42.** *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *Accord Caldwell v. State,* 780 A.2d 1037, 1052 (Del.2001); *id.* at 1052 n. 40 (citing general cases); *see generally State v. Cooley,* 457 A.2d 352, 356 (Del.1983) ("Any implied consent attributable to Cooley was given under circumstances which did not dissipate the effect of the illegal arrest."). *See also United States v. Green,* 111 F.3d 515, 521 (7th Cir.1997) (noting that the attenuation doctrine is used to support the admission of evidence in three general categories: "admission of voluntary confessions obtained after illegal arrests," "admission of evidence obtained during consensual searches following illegal seizures," "the admission of voluntary confessions given after *Miranda* warnings where an earlier confession was obtained before the defendant was advised of his fifth amendment rights," and "the admission of a witness' testimony at trial where the identity of the witness was discovered during an unlawful search") (citations omitted). This Court has also acknowledged that there are "state constitutional dimensions to the en-

█ The attenuation doctrine exception permits courts to find that the poisonous taint of an unlawful search and seizure has dissipated when the causal connection between the unlawful police conduct and the acquisition of the challenged evidence becomes sufficiently attenuated.[43] Thus, even if there is an illegal search or seizure, direct or derivative evidence, such as consent, may still be admissible if the taint is sufficiently "purged."[44] In *Brown v. Illinois*, the United States Supreme Court explained that courts should consider three factors when determining whether evidence that is impermissibly obtained may be sufficiently purged of the primary taint and admitted through the attenuation doctrine: (1) the temporal proximity of the illegality and the acquisition of the evidence to which the instant objection is made; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official conduct.[45] No "single

factor" is dispositive in determining whether the evidence should be suppressed.[46]

█ Applying these attenuation factors in this case, the record does not demonstrate that Lopez–Vazquez's consent was purged of the primary taint. The consent occurred during an illegal seizure. There were no intervening circumstances that would have provided independent probable cause or would otherwise have operated to dissipate the primary taint. These two considerations outweigh the fact that Detective Silva's conduct in asking for consent was neither egregious nor a flagrant abuse of police power.[47] Accordingly, the evidence that was obtained following the invalid *Terry* stop must be suppressed as fruit of the poisonous tree. The Superior Court should have granted Lopez–Vazquez's motion to suppress.

### III. Conclusion

The judgment of the Superior Court is **REVERSED** and this matter is **RE-**

---

forcement of the exclusionary rule," *Jones*, 745 A.2d at 873, and have applied them in finding that there is no good faith exception to the exclusionary rule when a warrant is issued without a demonstration of probable cause. *See Dorsey v. State*, 761 A.2d 807, 820 (Del.2000). Those dimensions are not at issue here.

43. *See Hudson v. Michigan*, 547 U.S. 586, 593, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006); *accord Brown*, 422 U.S. at 602–03, 95 S.Ct. 2254; *Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. 407; *Nardone*, 308 U.S. at 341, 60 S.Ct. 266.

44. *See Brown*, 422 U.S. at 602, 95 S.Ct. 2254; *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407 (noting that evidence is fruit of the poisonous tree depending on "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint") (internal quotation marks and citation omitted); *United States v. Thompson*, 106 F.3d 794 (7th

Cir.1997); *United States v. Chavez–Villarreal*, 3 F.3d 124, 127–28 (5th Cir.1993); *United States v. Butts*, 704 F.2d 701, 704 (3d Cir. 1983). *See also Caldwell*, 780 A.2d at 1052 ("Where evidence is the indirect product of an illegal search and seizure, we must ask whether the discovery of that evidence came about 'by exploitation of that illegality' or whether the State can show a break in the chain of events ... [showing] that the evidence was not a product of the constitutional violation.") (quoting *Wong Sun*, 371 U.S. at 484, 83 S.Ct. 407); *id.* at 1052 n. 40 (citing cases).

45. *Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254.

46. *Id.* at 603, 95 S.Ct. 2254.

47. *Cf. id.* at 605, 95 S.Ct. 2254 (finding that the illegality of the officer's conduct had a "quality of purposefulness" and finding that "[t]he manner in which Brown's arrest was affected gives the appearance of having been calculated to cause surprise, fright, and confusion.").

**MANDED** for further proceedings consistent with this Opinion.