IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AKEEM CROPPER | § | |
| | § | No. 595, 2014 |
| Defendant-Below, | § | |
| Appellant, | § | |
| | § | Court Below – Superior Court |
| v. | § | of the State of Delaware |
| | § | in and for New Castle County |
| STATE OF DELAWARE, | § | Cr. ID. No. 1312000103 |
| | § | |
| Plaintiff-Below, | § | |
| Appellee. | § | |

Submitted: September 16, 2015
Decided: September 16, 2015

Before **HOLLAND, VALIHURA,** and **VAUGHN,** Justices.


Upon appeal from the Superior Court. **AFFIRMED.**


Bernard J. O'Donnell, Esquire, Office of the Public Defender, Wilmington, Delaware, Attorney for the Defendant-Below, Appellant.


Andrew J. Vella, Esquire, Department of Justice, Wilmington, Delaware, Attorney for the Plaintiff-Below, Appellee.


**HOLLAND,** Justice:

The defendant/appellant Akeem Cropper ("Cropper") was indicted on charges of Possession of a Firearm By a Person Prohibited ("PFBPP"), Possession of Ammunition By a Person Prohibited ("PABPP") and Carrying a Concealed Deadly Weapon ("CCDEW"). Cropper filed a Motion to Suppress, which the Superior Court denied after a hearing. Following a non-jury trial, the Superior Court found Cropper guilty of PFBPP and PABPP.[1]

In this direct appeal, Cropper argues that the warrantless seizure and pat-down search was not supported by reasonable suspicion and the evidence seized from his person should have been suppressed. We have determined that argument is without merit. Therefore, the judgment of the Superior Court must be affirmed.

### *Facts*

On November 13, 2013, Wilmington Police Corporal James MacColl ("MacColl") and his partner, Brandon Mosley ("Mosley") were in the West Center City area of Wilmington, Delaware. While patrolling the area in a marked police car, the officers observed a car with an expired registration and stopped it. MacColl got out of the patrol car and approached the stopped vehicle on the driver's side, while Mosley approached on the passenger side.

There were three occupants in the stopped car—a female driver, a male rear seat passenger and Cropper, who was seated in the front passenger seat. MacColl

---

[1] The Superior Court granted Cropper's Motion for Judgment of Acquittal on the CCDEW charge.

2

asked for the driver's information and she produced her license and the vehicle's registration card. However, she was unable to provide MacColl with proof of insurance.

Meanwhile, Mosley asked for Cropper's identification and he produced a school identification card. The rear seat passenger did not provide the officers with any identification but did provide a name. After returning to the patrol car with Mosley, MacColl looked at Cropper's identification card and recognized him from prior encounters.

MacColl and Mosley ran DELJIS inquires on all three occupants of the car and discovered that the driver had a suspended license and the name the rear seat passenger gave them failed to produce a record. The fact that officers did not find a record in DELJIS matching the name given by the rear seat passenger raised their suspicion that the rear seat passenger had provided a fake name. The officers returned to the stopped car, and MacColl had a conversation with Cropper and the rear seat passenger. The rear seat passenger admitted that he did not give the officers his correct name because he had an outstanding warrant in Pennsylvania. At that point, both the driver and rear seat passenger were removed from the car while Cropper remained seated in the front passenger seat.

As MacColl was speaking with Cropper, he noticed that Cropper's responses to questions were very "clipped," he was short of breath, he was having a hard time

3

turning toward MacColl to make eye contact, and his hands were slightly shaking. MacColl was familiar with Cropper. Having worked in the West Center City area of Wilmington for six years, MacColl had encountered Cropper several dozen times and arrested him twice. Through his prior interactions with Cropper, MacColl had become personally familiar with Cropper, and knew that he was articulate and generally willing to converse with police officers.

MacColl asked Cropper to step out of the car because it was going to be towed. As Cropper exited the car, MacColl noticed that he kept his hands facing away from his body. MacColl asked Cropper whether he was carrying something and Cropper, with some apparent difficulty, said "no." At that point, MacColl told Cropper to put his hands on the car because he was going to conduct a pat-down. As MacColl began the pat-down, he discovered a handgun tucked into the waistband of Cropper's pants.

### *Passenger Identification Request Proper*

Cropper's initial argument on appeal is that his detention was not justified because he was the passenger companion of the driver who had committed a motor vehicle offense and that Cropper's detention was prolonged beyond that necessary to determine if the driver had committed any motor vehicle offense. This Court reviews a trial court's decision to grant or deny a motion to suppress evidence for

4

an abuse of discretion.[2] A trial court's legal decisions are review *de novo*.[3] "'To the extent the trial judge's decision is based on factual findings, [this Court] . . . review[s] for whether the trial judge abused his or her discretion in determining whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous.'"[4]

Under Delaware law "[a] police officer who observes a traffic violation has probable cause to stop the vehicle and its driver."[5] "During a lawful stop, a police officer may order both the driver and passengers out of the vehicle pending completion of the traffic stop."[6] At that point, "all passengers are subject to some scrutiny."[7] The police are permitted to question the passenger about his or her identity and those questions are not outside the scope of a reasonable investigation.[8] As this Court explained in detail:

> During a valid investigatory stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion. But the detainee is not obliged to respond." "[Q]uestions

---

[2] *Flonnory v. State*, 109 A.3d 1060, 1063 (Del. 2015) (citing *McVaugh v. State*, 2014 WL 1117722, at *1 (Del. Mar. 19, 2014); *Lopez-Vaquez v. State*, 956 A.2d 1280, 1284 (Del. 2008)).
[3] *Id.* (citations omitted).
[4] *Id.* (quoting *Lopez-Vazquez*, 956 A.2d at 1284).
[5] *Holden v. State*, 23 A.3d 843, 847 (Del. 2011); *see Pennsylvania v. Mimms*, 434 U.S. 107-09 (1977).
[6] *Holden*, 23 A.3d at 847.
[7] *Loper v. State*, 8 A.3d 1169, 1172-73 (Del. 2010); *see also Brendlin v. California*, 551 U.S. 249, 257 (2007) ("[E]ven when the wrongdoing is only bad driving, [a] passenger will expect to be subject to some scrutiny . . . .").
[8] *Loper*, 8 A.3d at 1173-74.

5

> concerning a suspect's identity are a routine and accepted part of many Terry stops. The ability to briefly stop a suspect, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." "[I]t is well established that an officer may ask a suspect to identify himself in the course of a *Terry* stop . . . ."[9]

To the extent Cropper argues he was unlawfully seized when the officer obtained his identification and he was "not free to leave," the argument is without merit. The officer was justified in asking for the identification of all passengers incident to the traffic stop.[10]

Cropper also contends that he was unlawfully seized when he was ordered out of the car. As this Court previously explained, "the police may order the driver or a passenger to exit the car after a valid traffic stop, and that order is not a 'seizure' under the Fourth Amendment."[11] If anything, the order to exit the car was a "mere inconvenience."[12] Since Cropper was already lawfully detained as a result of a valid traffic stop, there is no reason to conclude that he was seized a second time when he was ordered to leave the car because it was going to be towed.

---

[9]*Mills v. State*, 900 A.2d 101 (Del. 2006) (footnotes omitted).
[10]*See Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) (finding no Fourth Amendment requirement that a detainee be advised that they are "free to go" before consent to search will be deemed voluntary).
[11]*Loper*, 8 A.3d at 1173-74 (citing *Mimms*, 434 U.S. at 107-11).
[12]*Mimms*, 434 U.S. at 111.

6

## *Pat-Down Search Valid*

Therefore, the dispositive question in this case is whether the pat-down search was supported by independent facts, known to MacColl at the time, that justified that additional pat-down intrusion after Cropper was ordered to get out of the car.[13] The Fourth Amendment permits a police officer to frisk a person "who has been detained if he possesses a reasonable articulable suspicion that the detainee is armed and presently dangerous."[14] The officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."[15] A reviewing court must consider the totality of the circumstances "viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[16]

The record reflects that MacColl was familiar with Cropper. He had interacted with Cropper in the past on several dozen occasions and had previously arrested him twice. According to MacColl, Cropper's demeanor was markedly different than his usual demeanor. Cropper, who was normally articulate and willing to converse with MacColl, avoided eye contact and gave short answers to

---

[13] *Caldwell v. State*, 780 A.2d 1037, 1050 (Del. 2001).
[14]*State v. Henderson*, 892 A.2d 1061, 1064-65 (Del. 2006) (citing *Terry v Ohio*, 392 U.S. 1, 27 (1968)).
[15]*Id.* (quoting *Coleman v. State*, 562 A.2d 1171, 1174 (Del. 1989)).
[16]*Id.* (quoting *Jones v. State*, 745 A.2d 856, 861 (Del. 1999)).

questions. Cropper's abnormal behavior after the car stop put MacColl "on edge." In denying Cropper's Motion to Suppress, the Superior Court stated that it was "especially significant . . . that Corporal MacColl was concerned about this defendant's behavior and there was a particularized suspicion developed by the officer with respect to this individual suspect."

In addition to MacColl's personal knowledge and prior interactions with Cropper, MacColl had received specialized training in identifying characteristics of an armed gunman.[17] MacColl spoke to Cropper while he was seated in the car and noticed that his hands were shaking, he was short of breath, his mouth appeared to be dry, the answers he gave to MacColl's questions were "clipped" and he had a difficult time making eye contact. After Cropper was removed from the car, his hands were at his side, away from his body and facing outward. When MacColl asked Cropper whether he was carrying anything, Cropper could barely get the word "no" out of his mouth. MacColl's specialized training about the characteristics of an armed gunman taught him that the behaviors exhibited by Cropper were indicative of a person armed with a firearm. In fact, MacColl testified that Cropper's behavior and demeanor caused MacColl enough concern to make the hair on the back of his neck stand up.

---

[17] MacColl attended "Characteristics of an Armed Gunman" training on four occasions.

This Court has recognized the importance of officer safety during a traffic stop.[18] Nevertheless, officer safety does not justify a pat-down in all circumstances.[19] A pat-down requires reasonable articulable facts for concern about officer safety that are specific to the person frisked.[20]

In this case, MacColl identified facts specific to Cropper that would give rise to a reasonable concern for his safety, "viewed through the eyes of a reasonable, trained police officer in similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[21] Based upon the combination of MacColl's specialized objective training and subjective familiarity with Cropper's normal behavior, MacColl had a reasonable articulable belief that Cropper was armed and presently dangerous.[22] Accordingly, we hold that, under the totality of the circumstances, the pat-down search of Cropper by MacColl was permitted by the Fourth Amendment.

### *Conclusion*

The Superior Court's judgment of convictions is affirmed.

---

[18] *Robertson v. State*, 596 A.2d 1345, 1353 (Del. 1991); *see also Jones*, 745 A.2d at 873.
[19] *Caldwell*, 780 A.2d at 1051.
[20] *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979).
[21] *Henderson*, 892 A.2d at 1064-65 (quoting *Jones*, 745 A.2d at 861).
[22] *Id.*