IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TRACEY WEST, | § | |
| | § | No. 504, 2015 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1406017464 |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: May 11, 2016
Decided: July 6, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN** and **SEITZ**, Justices; constituting the Court *en banc*.

Upon appeal from the Superior Court. **AFFIRMED**.


Santino Cecotti, Esquire, and James O. Turner, Jr., Esquire, Office of the Public Defender, Wilmington, Delaware, for Defendant Below, Appellant Tracey West.

Sean P. Lugg, Esquire, Delaware Department of Justice, Wilmington, Delaware, for Plaintiff Below, Appellee State of Delaware.



**SEITZ**, Justice, for the Majority:

# I. INTRODUCTION

At about two o'clock in the morning police officer Thomas Gaul followed a car for three or four miles as it drifted back and forth in its lane. As the car entered a ramp to join S.R. 1, Officer Gaul saw the car swerve sharply to avoid hitting a concrete island. He turned on the emergency lights and signaled for the car to stop. After the car pulled over, Officer Gaul approached the car's driver, Tracey West, and smelled alcohol. West staggered out of the car and failed field sobriety tests. Gaul arrested West and charged her with an illegal lane change and driving under the influence.

Before trial, West moved to suppress the evidence that she was intoxicated. She claimed that Officer Gaul lacked the reasonable suspicion required by the Fourth Amendment to make an investigative stop of her car. Thus, any evidence of her intoxication gathered after the stop should be suppressed. After hearing testimony from the officer and reviewing the video from the police car camera, the Court of Common Pleas trial judge dismissed the lane change charge, but denied the motion to suppress. The court ruled that the community caretaker doctrine permitted the stop so the officer could check on the welfare of the driver. The State then introduced at trial the evidence of her intoxicated state, and a jury convicted West of drunk driving.

West appealed her conviction to the Superior Court, which affirmed the trial court's ruling on the community caretaker doctrine, and also found that Officer Gaul had reasonable suspicion to stop West for driving while intoxicated. West then appealed to our Court. She claims the community caretaker doctrine did not apply, and Officer Gaul

2

lacked reasonable suspicion as required by the Fourth Amendment for an investigatory stop of her car.

After a careful review of the record on appeal, we affirm the judgment of the Superior Court. It is unnecessary to decide whether the community caretaker doctrine should be extended to the facts of this case. Instead, we agree with the Superior Court that Officer Gaul had reasonable and articulable suspicion to make an investigatory stop of West's car. Her erratic driving culminating in almost crashing into a concrete island and swerving sharply before entering the highway provided reasonable suspicion for Officer Gaul to stop her car to investigate whether she was driving while impaired.

## II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

In the early morning hours of June 22, 2014, Officer Gaul was on routine patrol traveling on Route 273 westbound toward S.R. 1 in New Castle County, Delaware. He noticed a vehicle in front of him, which "was kind of driving a little bit erratically."[1] When asked what he meant by "erratically," he testified that it was "just kinda drifting back and forth in the lane," and that this occurred several times over a distance of three to four miles.[2] According to Officer Gaul, at one point the tires hit the shoulder and then came back into the lane. When the vehicle reached the ramp leading onto Route 1 northbound, it turned to get on the ramp and then narrowly avoided colliding with a concrete island. According to the officer, the driver of the vehicle had to make a "sharp

---

[1] App. to Opening Br. at 15.
[2] *Id.* at 16.

3

turn of the wheel to maintain the lane."[3]  At that point, the officer turned on his emergency lights and pulled the vehicle over.

When the officer initially observed the vehicle drifting back and forth in its lane, his subjective thought was that the operator may have been "tired or whatever, so that's what drew [his] attention to it."[4]  On cross-examination, the officer agreed that initially he did not have sufficient cause to stop the appellant, but as his observations increased, "there was reasonable suspicion."[5]  The Court of Common Pleas judge asked Officer Gaul why he stopped the car.  He said "basically safety of the operator," and that it was "more of a welfare check at that point, check on her."[6]  He further stated that when he pulled her over, it was not his intention to write her a ticket.

When the officer made direct contact with West after stopping her car, he noticed a "very strong odor of alcohol."[7]  After further investigation, the officer arrested West for making an illegal lane change and for driving under the influence.  The Court of Common Pleas dismissed the charge of making an illegal lane change, finding that no lane change occurred.  But the court denied her motion to suppress evidence of intoxication because the stop was justified under the community caretaker doctrine.  The jury then convicted West of driving under the influence.

---

[3] *Id.* at 17.
[4] *Id.* at 16.
[5] *Id.* at 31.
[6] *Id.* at 34.
[7] *West v. State*, 2015 WL 5121059, at *2 (Del. Super. Aug. 20, 2015) (quotations omitted).

4

West appealed her conviction and the denial of her motion to suppress evidence to the Superior Court. The Superior Court affirmed on the grounds that the stop was justified under the community caretaker doctrine and also on the alternative ground that West's erratic driving gave rise to a reasonable and articulable suspicion that she was impaired and therefore driving under the influence of alcohol.[8] This appeal followed.

## III. STANDARD OF REVIEW

We review the grant or denial of a motion to suppress for abuse of discretion.[9] We review the trial judge's factual findings to determine whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous.[10] To the extent that we examine the trial judge's legal conclusions, we review them *de novo* for errors in formulating or applying legal precepts.[11] "Where, as here, we are reviewing the denial of motion to suppress evidence based on an allegedly illegal stop and seizure, we conduct a *de novo* review to determine whether the totality of the circumstances, in light of the trial judge's factual findings, support a reasonable and articulable suspicion for the stop."[12]

---

[8] *Id.* at *4 ("[A]n officer's observation of a vehicle weaving from side to side, albeit within a lane, and making sharp corrective turns to maintain the lane, for a distance of three to four miles at 2:00 a.m. could give rise to reasonable suspicion that the driver is impaired, and would justify initiating a traffic stop on the vehicle.").

[9] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284 (Del. 2008).

[10] *Id.* at 1285.

[11] *Id.* at 1284–85.

[12] *Id.* at 1285. In the Court of Common Pleas, the State raised the argument that Officer Gaul had a reasonable and articulable suspicion to make the investigatory stop to determine whether West was driving while impaired. App. to Opening Br. at 40–41. Although the Court of Common Pleas did not decide the motion to suppress on this basis, the Superior Court and this Court can affirm on an alternative argument raised in the court below. *See RBC Capital*

# IV. ANALYSIS

The Fourth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."[13] The "essential purpose" of Fourth Amendment proscriptions "is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions . . . .'"[14]

When law enforcement directs a driver to stop her car, the State has "seized" the car and its occupants, and the protections of the Fourth Amendment apply. But it is only those searches and seizures that are "unreasonable" that run afoul of the Fourth Amendment. In the traffic stop context, under established law since *Terry v. Ohio*, a seizure is reasonable when a law enforcement officer conducts a brief investigatory traffic stop based on reasonable and articulable suspicion of criminal activity.[15]

---

*Markets, LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015). We also note that like the trial court we have the benefit of a video of much of the encounter, and thus the trial judge was not called upon to make credibility determinations.

[13] U.S. Const. amend. IV. West also brings her claims under Article I, § 6 of the Delaware Constitution, analogous to the Fourth Amendment to the United States Constitution. While the Delaware Constitution's search and seizure provision in some instances provides broader protections than the Fourth Amendment, *see Jones v. State*, 745 A.2d 856, 866 (Del. 1999), the broader protections have no application here.

[14] *Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)).

[15] *Terry v. Ohio*, 392 U.S. 1, 20–21 (1968); *see also* 11 *Del. C.* § 1902(a) ("A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination."). The statutory authorization to stop based on

6

Reasonable and articulable suspicion of criminal activity includes not just traffic offenses, but criminal activity such as drunk driving.[16]

As a court reviews the reasonableness of the officer's suspicion of criminal activity, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?"[17] The subjective good faith of the arresting officer is not controlling because "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police."[18]  In Delaware, the court can also "combin[e] objective facts with such an officer's subjective interpretation of those facts."[19]  When considering the objective facts, the limited consideration of an officer's subjective thoughts allows the court to accord weight to an officer's training and experience in

---

reasonable grounds equates to reasonable and articulable suspicion under the common law. *See Jones v. State*, 745 A.2d 856, 861 (Del. 1999); *see also Coleman v. State*, 562 A.2d 1171, 1174 (Del. 1989); *Malloy v. State*, 462 A.2d 1088, 1091 (Del. 1983) ("Before stopping [a suspect's] car, the police [have] to have a particularized and objective basis for suspecting that he [is] violating the traffic laws.").

[16] *See Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) ("The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." (internal quotations omitted)); *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." (citations omitted)); *Malloy*, 462 A.2d at 1091 (driving away from a tavern, making wide turns, and driving erratically created reasonable articulable suspicion to make investigatory stop on suspicion of DUI).

[17] *Terry*, 392 U.S. at 21–22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

[18] *Id.* at 22 (quoting *Beck v. Ohio*, 379 U.S. 89, 97 (1964)).

[19] *Jones*, 745 A.2d at 861.

detecting criminal activity.[20]  In other words, the objective facts are viewed through the lens of a reasonable, trained police officer.

Whether reasonable and articulable suspicion of criminal activity exists depends on the totality of the circumstances and "the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act."[21] The Supreme Court of the United States recently observed that we should use a "commonsense approach" when evaluating the Fourth Amendment's reasonable suspicion requirement.[22]  The reviewing court should "appropriately recognize certain driving behaviors as sound indicia of drunk driving."[23]

Here, the objective facts establish reasonable and articulable suspicion that West might have been driving while impaired.  We have the advantage of a video from Officer Gaul's patrol car recording some of the events leading to West's stop.  The video shows West drifting back and forth in her lane.  Officer Gaul confirmed that he followed West for three or four miles while she drove "kind of erratically."  Although weaving within a

---

[20] *See Lopez-Vazquez*, 956 A.2d at 1287 ("[T]he court 'must consider the inferences and deductions that a trained officer could make which might well elude an untrained person.'" (quoting *Riley v. State*, 892 A.2d 370, 375 (Del. 2006))); *see also Robertson v. State*, 596 A.2d 1345, 1350–51 (Del. 1991) ("Although we give due deference to an officer's experience and knowledge, the facts which form the basis of the reasonable suspicion must be capable of measurement against an objective standard.").

[21] *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

[22] *Navarette*, 134 S. Ct. at 1690.

[23] *Id.* (citing *People v. Wells*, 136 P.3d 810, 811 (2006) ("weaving all over the roadway"); *State v. Prendergast*, 83 P.3d 714, 715–716 (2004) ("cross[ing] over the center line" on a highway and "almost caus[ing] several head-on collisions"); *State v. Golotta*, 837 A.2d 359, 361 (2003) (driving "all over the road" and "weaving back and forth"); *State v. Walshire*, 634 N.W.2d 625, 626 (Iowa 2001) ("driving in the median")).

lane by itself may be insufficient to establish reasonable suspicion of impaired driving, as the video shows, West then nearly crashed into a concrete island and swerved sharply while entering the ramp to a major highway. Looking at the totality of the circumstances—the erratic driving for three or four miles followed by a near crash into a concrete island and sharp turn correction—leads us to conclude that Officer Gaul had reasonable and articulable suspicion to stop West's car and investigate whether she was driving while impaired.

We acknowledge the ambiguity in the evidentiary record about Officer Gaul's subjective beliefs. At one point Officer Gaul testified to his belief that reasonable suspicion existed, while at another point he stated his subjective view that he did not intend to write West a traffic ticket when pulling her over. But Officer Gaul's subjective belief about whether reasonable suspicion existed is not controlling. As noted previously, it is the objective facts that control the outcome, not the officer's subjective beliefs about reasonable suspicion.[24] And while West's conduct might be explained by another cause

---

[24] In *Terry*, the United States Supreme Court emphasized the importance that the facts and inferences from them form an objectively reasonable basis for the official conduct triggering Fourth Amendment scrutiny:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a [person] of reasonable caution in the belief that the action taken was appropriate?

392 U.S. at 21–22 (internal quotations omitted)); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."). This

such as driver distraction or tiredness, reasonable suspicion "need not rule out the possibility of innocent conduct."[25]

We agree with other courts that "if failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy."[26] Not all driver conduct is indicative of intoxication.[27] But what happened here is much more than weaving within the same lane.[28] Taking a

Court's decisions are consistent with an objective view of the facts justifying the investigative stop, rather than the subjective beliefs of the individual officers executing the searches and seizures. *See Lopez-Vazquez*, 956 A.2d at 1287 ("[R]easonable suspicion . . . requires 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" (quoting *Cortez*, 449 U.S. at 417); *Jones*, 745 A.2d at 861 ("A determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such [a reasonable, trained police officer's] subjective interpretation of those facts."); *see also Quarles v. State*, 696 A.2d 1334, 1337 (Del. 1997) ("[T]he court must consider the totality of the circumstances, the 'whole picture,' as viewed through the eyes of a police officer who is experienced in discerning the ostensibly innocuous behavior that is indicative of narcotics trafficking.").

[25] *Moore v. State*, 997 A.2d 656, 667 (Del. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

[26] *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir. 1993), *overruled on other grounds by United States v. Botero-Ospina*, 71 F.3d 783, 786–87 (10th Cir. 1995).

[27] *See Navarette*, 134 S. Ct. at 1691 ("Of course, not all traffic infractions imply intoxication. Unconfirmed reports of driving without a seatbelt or slightly over the speed limit, for example, are so tenuously connected to drunk driving that a stop on those grounds alone would be constitutionally suspect.").

[28] The Court of Common Pleas dismissed the charge against West for improperly changing lanes. An observation of an actual violation of a traffic law would likely have been necessary to give Officer Gaul probable cause, and would additionally sustain the lesser standard for reasonable suspicion. *Eskridge v. Voshell*, 593 A.2d 589 (Del. 1991) (Table) ("There is reasonable suspicion, and hence probable cause, when a police officer observes a driver committing a traffic violation."). But the fact that Officer Gaul observed no specific traffic violation does not speak to whether he had reasonable suspicion to make an investigative stop, which requires only that there be some "particularized and objective basis" for suspecting criminal activity. *Navarette*, 134 S. Ct. at 1687; *Malloy*, 462 A.2d at 1091.

commonsense view of the facts, and with the benefit of the video evidence, the weaving, coupled with the sharp swerve to avoid hitting a concrete island is easily recognized as driving behavior indicative of drunk driving.

## V. CONCLUSION

As we emphasized in *Bloomingdale v. State*, the clearance to conduct an investigative stop "does not mean that the officer can go further and require a sobriety test in the absence of additional evidence that provides a reasonable basis for that action. It simply means that the officer ought to be able to make a brief stop to inquire about the driver's fitness to operate a vehicle, given the public interest in ensuring that unsafe drivers be taken off the road promptly."[29]

Officer Gaul's care to avoid concluding that the dangerous driving he saw on the road was for certain caused by the driver's impairment enhances, rather than detracts from, the reasonableness of his actions. The officer acted on circumstances that give rise to a reasonable suspicion that someone was driving under the influence, and took reasonable steps to protect the public without getting ahead of himself. He made the stop to protect the public and to inquire, and only after further objective circumstances were observed that suggested that the cause of the danger was drunk driving, did he proceed further to investigate whether that was in fact the case. The Superior Court correctly held that reasonable suspicion existed to stop West for possible driving under the influence. The judgment of the Superior Court is affirmed.

---

[29] 842 A.2d 121, 1222 (Del. 2004).

11

**VALIHURA**, Justice, concurring in the judgment:

The Court holds that "Officer Gaul had reasonable and articulable suspicion to stop West's car and investigate whether she was driving while impaired." It reasons that "weaving, coupled with the sharp swerve to avoid hitting a concrete island is easily recognized as driving behavior indicative of drunk driving." I respectfully disagree. Rather, I believe that the stop was justified based upon Officer Gaul's reasonable mistake of fact in suspecting that West had failed to remain within a single lane multiple times over the course of traveling three to four miles on Route 273. Thus, I concur in the result only because it was *objectively* reasonable for a law enforcement official in Officer Gaul's position to think that West violated Delaware law by failing to remain within her lane.

We are in agreement that a traffic stop is a "seizure" of the occupant of the vehicle and must be conducted in accordance with the Fourth Amendment to the United States Constitution.[1] We also agree that in order to justify such a seizure, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law."[2] But the Majority and I differ as to which suspected violation of law should be the basis for the stop. This matters because it affects the nature of the investigation that can be performed thereafter. Here, Officer Gaul had a reasonable, but mistaken, belief that West had failed to remain within her lane.

---

[1] *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (citing *Brendlin v. California*, 551 U.S. 249, 255-59 (2007)).

[2] *Id.* (quoting *Navarette v. California*, 134 S. Ct. 1683, 1687-88 (2014)).

1

In *Heien v. North Carolina*,[3] Chief Justice Roberts, writing for the United States Supreme Court, stated: "We have recognized that searches and seizures based on mistakes of fact can be reasonable."[4] Officer Gaul's reasonable mistake of fact gave him "a particularized and objective basis for suspecting" West of breaking the law and, therefore, justified the traffic stop.[5]

My view is that a reasonable suspicion of driving under the influence did not develop until *after* Officer Gaul made contact with West.[6] The Majority holds that a reasonable suspicion of driving under the influence existed prior to the stop. I believe that my reasoning is more closely tethered to what actually happened in this case. If West had not shown signs of intoxication upon being stopped, her detention would have been limited constitutionally to addressing the lane violation—a DUI-focused detention would have been unreasonable,[7] since a traffic stop must be "reasonably related in scope

---

[3] 135 S. Ct. 530 (2014).

[4] *Id.* at 536.

[5] *Navarette*, 134 S. Ct. at 1687 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)) (internal quotation marks omitted).

[6] *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew *before* they conducted their search." (emphasis added)).

[7] The Majority appears to go even further than the arguments advanced by the State in its answering brief submitted to this Court. *See* Ans. Br. 15 ("Thus, immediately after the lawful stop, [Officer] Gaul was presented with *additional facts* supporting a reasonable belief that West was operating her motor vehicle while under the influence of alcohol. The *continued investigation* resulting in her arrest was justified." (emphasis added)). The State seems to refrain from collapsing the pre- and post-stop events, and thus avoids the conclusion reached by the Majority that, prior to the stop, there was a reasonable basis to believe that West was impaired *by alcohol*. The State's appropriately restrained position is also evident from its closing argument at trial, during which it stated: "Also[,] Corporal Gaul's testimony wasn't necessarily that he believed she was under the influence at that time. He just believed that there was something wrong and so he stopped in order to lend assistance. *And at that point*[,] *once he spoke to the* [*d*]*efendant*[,] *it progressed into the DUI investigation*." Transcript of Trial at 114, *State v. West*, Cr. ID. No. 1406017464 (Del. Com. Pl. Jan. 13, 2015) (emphasis added) (alterations added).

to the circumstances which justified" the initial stop.[8]  Neither the arresting officer nor

the trial court went as far as this appellate court in finding that the observable facts

*preceding* the initial traffic stop provided a particularized and objective basis for

suspecting West of the more serious crime of driving under the influence.[9]

I see several problems arising from the Majority's reasoning.  The Court's holding

sets a new and very low bar to justify a traffic stop for driving under the influence.  It

appears to conflict with other decisions of this Court that say more is needed to seize a

citizen for reasonable suspicion of driving under the influence.   For example, in *Lefebvre*

*v. State*[10] this Court observed:

> [T]he commission of a traffic offense combined with an odor of alcohol,
> standing alone, do not constitute probable cause to arrest for a DUI offense.
> Nevertheless, those two facts may give rise to a reasonable suspicion of
> DUI and justify a request that the driver perform some field sobriety tests.
> The driver's performance on those tests may give rise to facts that either

---

[8] *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 188 (2004) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)) (internal quotation marks omitted).  The State acknowledges that "[t]he duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop."  Ans. Br. 14 (quoting *Caldwell v. State*, 780 A.2d 1037, 1047 (Del. 2001)) (internal quotation marks omitted) (alteration added).

[9] The Superior Court found that "reasonable suspicion *arose* to justify *continuing* the traffic stop beyond the initial contact with [the d]efendant."  *West v. State*, 2015 WL 5121059, at *4 (Del. Super. Aug. 20, 2015) (emphasis added).  Thus, its decision is more appropriately read to mean that a DUI investigation encompassing field sobriety tests was not justified based on the events *leading up to the stop*.  Referring to West's glassy, bloodshot eyes and the odor of alcohol when she spoke, the Superior Court concluded that "there was reasonable suspicion of [driving under the influence] to justify *extending* the stop to administer field sobriety tests."  *Id.* (emphasis added).  I would not give its subsequent "note" that West's conduct "could give rise to reasonable suspicion that the driver [wa]s impaired" such weight as to undercut its earlier, above-quoted analysis. *Id.* (citations omitted).

[10] 19 A.3d 287 (Del. 2011); *see also id.* at 293 (holding that an odor of alcohol and a traffic violation, standing alone, do not constitute probable cause for a DUI).  Here, we have no actual traffic violation, but rather weaving *within* a marked lane and a mistaken view that West had failed to maintain that lane.  This conduct violated no Delaware law, as the State ultimately agreed.

3

elevate what was only a suspicion into probable cause, or dispel the suspicion and result in no DUI arrest.[11]

Here, the odor of alcohol and other signs of intoxication were not apparent until after West was stopped.

The practical difference between my view and that of the Majority concerns the nature of the investigation that can be performed after the traffic stop. An investigative detention must be delineated in time and scope to effectuate the purpose of the stop.[12] If a citizen is suspected of a traffic violation—for example, failing to maintain a single lane—the detention must be limited to addressing that violation (presumably by issuing a ticket, a warning, or letting the operator go).[13] Thus, under my reasoning, based upon the observable events leading to the stop in this case, a driver would not be subject to a DUI-related investigative detention, including field sobriety tests—unless, as in the instant matter, there were signs of intoxication that became evident *after* the stop. But under the Majority's reasoning, a driver would be subject to field sobriety tests based upon legal conduct occurring prior to a stop. The Majority and I agree on the result only, because if a citizen is pulled over for failure to maintain a lane and the officer *thereafter* notices an

---

[11] *Id.* at 295 (citation omitted).

[12] *See Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) ("Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'— to address the traffic violation that warranted the stop and attend to related safety concerns." (internal citations omitted)); *id.* ("Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." (internal quotation marks omitted) (internal citation omitted) (alteration in *Rodriguez*)); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").

[13] The officer may also check the driver's license, determine whether there are outstanding warrants against the driver, and inspect the vehicle's registration and proof of insurance. *Rodriguez*, 135 S. Ct. at 1615 (citing *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979)) (internal citations omitted).

odor of alcohol, *then*, as we said in *Lefebvre*, those facts might give rise to a reasonable suspicion that the operator is driving under the influence. That is what happened here.

The Majority attempts to cabin the effects of its holding by stating that if suspicion of driving under the influence is the basis for the stop, that does not mean the officer can conduct field sobriety tests. It states:

> As we emphasized in *Bloomingdale v. State*, the clearance to conduct an investigative stop "does not mean that the officer can go further and require a sobriety test in the absence of additional evidence that provides a reasonable basis for that action. It simply means that the officer ought to be able to make a brief stop to inquire about the driver's fitness to operate a vehicle, given the public interest in ensuring that unsafe drivers be taken off the road promptly." The Superior Court correctly held that reasonable suspicion existed to stop West for possible driving under the influence.

*Bloomingdale* supports my view. The suspected violation there was not driving under the influence, but rather "moving violations."[14] As the *Bloomingdale* Court said, "once [the defendant] stopped his car, [the officer] quickly *developed* reasonable suspicion supporting his administration of sobriety tests. He smelled alcohol emanating from the vehicle, he observed empty alcohol containers in the car, and [the defendant] admitted that he had been drinking."[15] There, we held that a reasonable suspicion that the defendant was driving under the influence developed *after* the stop for moving violations. In the instant matter, the Court concludes, based upon conduct that was not a violation of law, that there was reasonable suspicion of driving under the influence *prior* to the stop.

By attempting to avoid the undesirable result of its conclusion—that a reasonable suspicion of driving under the influence justifies a more intrusive DUI-related

---

[14] *Bloomingdale v. State*, 842 A.2d 1212, 1219 (Del. 2004).
[15] *Id.* at 1222 (emphasis added).

investigative detention—the Majority runs head-first into the long line of cases that say that the scope of the detention and investigation must be tailored to the purpose of the stop. The Majority's attempt to soften that blow is inconsistent with this established case law, as well as *Bloomingdale*. Instead, it is more consistent with the application of the community caretaker doctrine, permitting an officer to seize a driver simply to inquire about his or her fitness to operate an automobile.[16]

### A.    *Factual and Procedural Background*

In my view, justifying the stop based upon Officer Gaul's mistaken belief that West had committed a moving violation is more consistent with what happened in this case. At approximately 2:00 a.m. on June 22, 2014, Officer Gaul observed a vehicle traveling westbound on Route 273 that "was kind of driving a little bit erratically." The vehicle was "drifting back and forth in the lane." In the course of traveling toward Route 1, the vehicle tagged the fog and center lines on multiple occasions. The vehicle,

---

[16] I nonetheless agree with the Majority's apparent reluctance to affirm on the basis of the community caretaker doctrine. That doctrine, prior to this case, has never been applied in Delaware to justify a stop of a moving vehicle. The community caretaker function, as described by the United States Supreme Court in *Colorado v. Bertine*, 479 U.S. 367 (1987), *South Dakota v. Opperman*, 428 U.S. 364 (1976), and *Cady v. Dombrowski*, 413 U.S. 433 (1973), did not involve investigative stops and seizures. Rather, those cases involved the admissibility of incriminating evidence discovered during a standard police procedure of inventorying property that had been properly taken into custody. A majority of States appear to have adopted the community caretaker doctrine in some form. Many recognize, however, that the community caretaking function must be cautiously applied to minimize the risk of pretextual traffic stops. *See, e.g.*, *Trejo v. State*, 76 So.3d 684, 689 (Miss. 2011) (quoting *State v. Rinehart*, 617 N.W.2d 842, 844 (S.D. 2000)) ("[C]ourts must carefully analyze the totality of the circumstances, so that the community caretaking function is cautiously and narrowly applied in order to minimize the risk that it will be abused or used as a pretext for conducting an investigatory [stop and] search for criminal evidence." (internal quotation marks omitted) (alterations in *Trejo* and added)); *State v. Rincon*, 147 P.3d 233, 237 (Nev. 2006) ("In adopting the community caretaking doctrine, we reiterate that the exception will be narrowly applied and an inquiry stop is justified only where there are clear indicia of an emergency." (citations omitted)).

according to the officer, weaved within its lane "[s]everal times over a distance of three to four miles" and, at one point, struck the shoulder of the roadway. When it reached an on-ramp to enter Route 1 northbound, it made a sharp turn to avoid colliding with a concrete island in the roadway. Officer Gaul then activated his emergency equipment and conducted a traffic stop.

At the time when Officer Gaul pulled West over, it was not his intention to write her a ticket. Rather, according to the officer, the purpose of the stop was to perform "a welfare check," in part because it was 2:00 a.m. and "operators are tired or whatever." Upon making contact with West, and after further investigation, Officer Gaul arrested her for driving under the influence and for making an illegal lane change.[17]

At the hearing on West's motion to suppress, Officer Gaul testified that he believed that West had failed to maintain her lane when she narrowly avoided colliding with the median adjacent to the Route 1 on-ramp.[18] While the video of the incident

---

[17] *See, e.g.*, Charge History Record, *State v. West*, Cr. ID. No. 1406017464 (Del. Com. Pl. Mar. 31, 2015) (identifying June 22, 2014 charge for failing to remain within a single lane); Information by the A.G., *State v. West*, Cr. ID. No. 1406017464 (Del. Com. Pl. Aug. 22, 2014) ("TRACEY N [*sic*] WEST, on or about the 22nd day of June, 2014, in the County of New Castle, State of Delaware, did operate a vehicle upon a public roadway which has been divided into two or more clearly marked lanes of traffic, and did fail to remain in her lane of travel until movement to another lane could be made with safety."); Court Transfer Letter, *State v. West*, Cr. ID. No. 1406017464 (Del. J.P. Ct. July 9, 2014) ("Failed to remain within a single lane[.]").

[18] A23; *see also id.* (Q. "Did she leave her lane [when attempting to merge onto Route 1]?" A. "Yes, I believe she did."); A24 (Q. "Is it your position that she leaves her lane as she's turning onto the ramp?" A. "Well, it's a single lane, so, yes; I would say yes."); A27 (Q. "Now is it your contention that she drove on the line or over the line?" A. "You know, from what I saw, I saw the spontaneous jerking back into the lane. I would say, you know, she came close to the line if not crossing it."); A28 (Q. "Can we agree that the video shows that there's a gap between the markings on the lane and that concrete median?" A. "Yes." Q. "Based on, if you can remember, on your knowledge and experience as a state trooper for ten years, can you tell us approximately how far away from the center median that line would be?" A. "I do not -- you

7

captured by the officer's patrol vehicle did not actually show that West had failed to maintain her lane, Officer Gaul testified that there were also lane violations that preceded the video recording, as the video only captured a portion of the time he followed West. When asked whether the video indicated that West drove on the shoulder of the roadway, Officer Gaul testified as follows: "Well, as I testified[,] there's actually[] what I observed before the video started. 'Cause when I activated my emergency equipment[,] that's when the video came back." Further, he testified that when he began following West, he did not have reasonable suspicion to stop her, "[b]ut as distance increased, yes, there was reasonable suspicion."

After viewing the video recording of the incident during the hearing on the motion to suppress, Officer Gaul could not say for sure that West had failed to maintain her lane. The Court of Common Pleas found that the evidence did not support a conviction for improper lane change, and the State entered a *nolle prosequi* on the charge. The case proceeded to trial solely on the basis of the DUI charge. A jury then convicted West of driving under the influence.

### B.    *Officer Gaul's Mistake of Fact was Reasonable*

---

know, I can't be exact. In an area like that[,] it's maybe three or four feet. It's not far." Q. "Far enough for a tire to cross over without breaking the --" A. "Yes."); A35 (The Court: "Did you observe her actually depart from her lane of travel?" A. "Well, from what I saw when the [*sic*] merging onto Route 1 there and the turn which is in, I guess, dispute here, the sudden jerking because it was two lanes there where they came in, the turn lane from 273 westbound and also eastbound had merged. It appeared that when she made that turn she turned a lot and then came back into her lane, almost striking the median.").

8

The "ultimate touchstone of the Fourth Amendment is reasonableness."[19] West's seizure comports with the Constitution only if Officer Gaul had a reasonable and articulable suspicion that West was breaking the law when operating her vehicle. The "principal components" of that determination "will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause."[20] Therefore, in evaluating a traffic stop, a reviewing court is not permitted to consider post-seizure facts. As this Court made clear in *Jones v. State*,[21] what transpires after the stop "is not a proper factor in assessing the validity of a seizure."[22]

When determining the constitutional reasonableness of a traffic stop the "actual motivations of the individual officers involved" are of no moment.[23] "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."[24] Accordingly, "[t]he foremost method of enforcing traffic and vehicle safety regulations . . . is acting

---

[19] *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)) (internal quotation marks omitted); *see also Wheeler v. State*, 135 A.3d 282, 296 (Del. 2016).
[20] *Ornelas v. United States*, 517 U.S. 690, 696 (1996).
[21] 745 A.2d 856 (Del. 1999).
[22] *Id.* at 862.
[23] *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Heien*, 135 S. Ct. at 539 (citing *Whren*, 517 U.S. at 813) ("We do not examine the subjective understanding of the particular officer involved.").
[24] *Whren*, 517 U.S. at 813 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)) (internal quotation marks omitted).

9

upon observed violations, which afford the quantum of individualized suspicion necessary to ensure that police discretion is sufficiently constrained."[25]

But "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'"[26] As the United States Supreme Court observed in *Heien*, "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved."[27] "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground" when seizing an individual.[28] "The limit is that 'the mistakes must be those of reasonable men.'"[29]

In my view, it would be objectively reasonable for a law enforcement official in Officer Gaul's position to think that West had failed to remain within a single lane in violation of 21 *Del. C.* § 4122(1).[30] At a minimum, the record evidence, including the video recording of the incident, indicates that West tagged the fog and center lines on multiple occasions when traveling on Route 273. Prior to stopping West, the officer

---

[25] *Id.* at 817-18 (quoting *Prouse*, 440 U.S. at 654-55, 659) (internal quotation marks omitted) (internal citations omitted) (alterations in *Wren*).

[26] *Heien*, 135 S. Ct. at 536 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

[27] *Id.* at 539 (citing *Whren*, 517 U.S. at 813) (emphasis in original).

[28] *Id.* at 536.

[29] *Id.* (quoting *Brinegar*, 338 U.S. at 176).

[30] 21 *Del. C.* § 4122(1) provides that, "[w]henever any roadway has been divided into 2 or more clearly marked lanes for traffic," "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

believed that he observed the vehicle leave its lane before making the sharp, corrective turn to avoid the median. Moreover, Officer Gaul testified that the video recording captured only a portion of the observable facts he relied upon in forming a reasonable suspicion that West had violated the law.

## C.  *Reasonable Suspicion of Driving Under the Influence is Found by the Appellate Courts Only*

The Superior Court affirmed the decision of the Court of Common Pleas on the basis of the community caretaker doctrine, but commented that West's driving could give rise to a reasonable suspicion that a driver was impaired.[31] The Majority, without addressing the community caretaker doctrine, adopts the Superior Court's reasonable suspicion of impairment comment and affirms on that basis.[32]

---

[31] The Superior Court commented that:

> Although the Court [of Common Pleas] . . . based its opinion on the community caretaker doctrine, we note that an officer's observation of a vehicle weaving from side to side, albeit within a lane, and making sharp corrective turns to maintain the lane, for a distance of three to four miles at 2:00 a.m. could give rise to reasonable suspicion that the driver is impaired, and would justify initiating a traffic stop on the vehicle.

*West*, 2015 WL 5121059, at *4 (citations omitted).

[32] The Superior Court's comment contains a footnote citing eleven cases. None is a decision by a Delaware court. Rather, they are decisions from Alaska, Arizona, Kansas, Minnesota, Nebraska, North Dakota, California, Florida, Illinois, Missouri, and Oregon. The decisions from other States generally support the proposition that weaving within a lane could justify an investigatory stop of a vehicle. But other cases hold that more is needed to justify an investigatory stop. *See, e.g.*, *Amundsen v. Jones*, 533 F.3d 1192, 1199 (10th Cir. 2008) ("There are limits, however, on the extent to which weaving can serve as a factor creating reasonable suspicion of driving under the influence. For instance, an isolated incident of crossing into another lane will not ordinarily create reasonable suspicion of driving while impaired. Nor will weaving within a lane, without more, ordinarily create reasonable suspicion of driving under the influence." (internal citations omitted)); *Rowe v. State*, 769 A.2d 879 (Md. 2001) (reversing lower court decision that upheld a traffic stop where driver was "weaving off the highway" and

11

Although it does not factor into our objective reasonableness assessment, Officer Gaul never testified that he suspected West of driving under the influence. His testimony was that he suspected West was tired or otherwise in need of assistance. To date, this Court and the Superior Court have found weaving within one's own lane sufficient to justify a stop, but only in combination with other observable facts, such as weaving across lanes, drifting onto the shoulder, committing multiple traffic violations, or nearly causing a collision with another motorist.[33] The Majority's decision, therefore, breaks new ground in holding that weaving within a lane, accompanied by a sharp, corrective turn, can justify a traffic stop and investigation of the driver for *driving under the influence*.

Police officers have the expertise to "draw[] inferences and make[] deductions" that "might well elude an untrained person."[34] In my view, Officer Gaul's judgment, based on the observable facts preceding the seizure, that there was no reasonable

---

where the officer stated that the incident occurred when it was late and at a time when "people are coming home from bars and are getting tired").

[33] *See, e.g.*, *Malloy v. State*, 462 A.2d 1088 (Del. 1983) (upholding an investigatory stop where police officers observed a "possible equipment defect" and saw the driver leave a tavern, make a "wide turn onto the road[,]" drive "erratically[,]" weave "across lanes and within [his] own lane for 1 ½ miles"); *State v. McNeil*, 2012 WL 3834902 (Del. Super. Aug. 21, 2012) (finding that officers had reasonable suspicion that the driver of a vehicle was impaired where the officers observed the driver commit several minor traffic violations, but decided to stop the vehicle after it swerved within its lane three to four times and drove with its turn signal on "for an extended period of time"); *State v. Anderson*, 2010 WL 4056130 (Del. Super. Oct. 14, 2010) (holding that an officer had a reasonable and articulable suspicion that a driver was engaged in conduct that could constitute a traffic offense where the driver, within the span of a one-and-a-half mile distance, "modestly" drifted out of his lane on at least two occasions, made "several 'sharp' corrections in order to keep his vehicle within the designated lane markings[,]" and narrowly avoided striking another vehicle). Opinions of the Court of Common Pleas vary as to whether fact patterns involving weaving within a lane would support reasonable suspicion.

[34] *Cortez*, 449 U.S. at 418.

suspicion of criminal conduct at the time of the stop—other than West's failure to maintain her lane—was correct. The trial court similarly concluded that there was no basis for concluding prior to the stop that West was driving while intoxicated. The Majority states that our standard of review is *de novo* "to determine whether the totality of the circumstances, *in light of the trial judge's findings*, support a reasonable and articulable suspicion for the stop." But the trial judge's findings do not support the conclusion that there was reasonable suspicion that West was driving under the influence at the time of the stop.

### D. *Conclusion*

Does a jerking of the wheel accompanied by some weaving *within* a lane now provide reasonable suspicion of driving under the influence? Are we now at risk of being stopped and investigated for driving under the influence if we weave within our lane while trying to find the defroster and jerk the wheel, or if we spill coffee on ourselves and swerve within our lane? Are we then subject to being pulled over and having to recite the alphabet from "E" to "P," count backwards from 69, walk in a straight line while touching the heel of one foot to the toe of the other, and balance on one foot while keeping our hands at our sides?[35]

---

[35] *See* Transcript of Trial at 33-39, *State v. West*, Cr. ID. No. 1406017464 (Del. Com. Pl. Jan. 13, 2015) (indicating that Officer Gaul required West to recite the alphabet from "E" to "P," count backwards from 69, walk in a straight line while touching the heel of one foot to the toe of the other, and balance on one foot while keeping her hands at her sides).

"The States and the Federal Government have a 'paramount interest . . . in preserving the safety of . . . public highways.'"[36] "Alcohol consumption is a leading cause of traffic fatalities and injuries."[37] Balancing these important interests against our freedom to come and go without unreasonable interference is difficult, as this case surely illustrates. I believe that the officer's instincts were correct and that his mistake of fact that West failed to remain within a single lane was reasonable, and I would affirm on that basis—not on the grounds of reasonable suspicion of driving under the influence. Unfortunately for West, the result is the same because, once she was stopped, there were indicia of her intoxication that justified extending the investigation for driving under the influence. Accordingly, I concur in the judgment only.

---

[36] *Birchfield v. North Dakota*, 2016 WL 3434398, at *19 (June 23, 2016) (quoting *Mackey v. Montrym*, 443 U.S. 1, 17 (1979)) (alterations in *Birchfield*).
[37] *Id.*